ELLIS v. DODGE BROS.

(District Court, N. D. Georgia. October 19, 1916.)

No. 209.

CONTRACTS ☞10(4)—VALIDITY—LACK OF MUTUALITY.

A contract by which a manufacturer of motor cars granted the right to a dealer to sell its cars within a certain territory for its term, with an agreement by the dealer to purchase a stated number of cars each month during the term, but which did not obligate the manufacturer to furnish the cars, and further provided that it might be canceled by either party at any time on 15 days' notice, *held* void for lack of mutuality, and not enforceable.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 37; Dec. Dig. ☞10(4).]

At Law. Action by Frampton E. Ellis, administrator of the estate of Samuel A. Pegram, deceased, against Dodge Bros., a corporation. On demurrer to petition. Sustained.

Bryan, Jordan & Middlebrooks, of Atlanta, Ga., for plaintiff.

McGregor & Bloomer, of Detroit, Mich., and King & Spalding, of Atlanta, Ga., for defendant.

NEWMAN, District Judge. This suit was brought originally by Samuel A. Pegram, now deceased, and, since his decease, his administrator, Frampton E. Ellis, has been made party plaintiff. The suit is grounded largely, or almost entirely, on a contract between the parties; the one, Dodge Bros., a Michigan corporation, being a manufacturer of automobiles, and the other, Samuel A. Pegram, doing business in the city of Atlanta under the name of Pegram Motor Car Company, being a dealer in automobiles. The contract is as follows:

"With a view to outlining the business relations that shall exist between Dodge Bros., to be known hereinafter in this agreement as the manufacturer, and Pegram Motor Car Company, of Atlanta, Fulton county, Ga., to be known hereinafter as the dealer, certain conditions and statements of facts are hereinafter set forth.

"Territory: The manufacturer grants unto the dealer the right to sell Dodge Bros. motor cars, and repair parts, during the life of this agreement, in the following described territory: Cobb, Fulton, De Kalb, Gwinnett, Henry, Clayton, Campbell, Douglas.

"Discounts: The dealer's purchases of complete motor cars shall be billed to the dealer and be paid for by him at the following percentages off the manufacturer's list price:

| | | | |
|---|---|---|---|
| 50 to 74 | motor cars, inclusive | .................................... | .18% |
| 75 to 99 | motor cars, inclusive | .................................... | .19% |
| 100 to 199 | motor cars, inclusive | .................................... | .20% |
| 200 to 399 | motor cars, inclusive | .................................... | .21% |
| 400 to 599 | motor cars, inclusive | .................................... | .22% |
| 600 to 799 | motor cars, inclusive | .................................... | .23% |
| 800 to 999 | motor cars, inclusive | .................................... | .24% |
| 1000 motor cars or more | | .................................... | .25% |

"(The copy of the contract as attached to the declaration includes the following three discounts not shown in copy of contract filed:

| | | | |
|---|---|---|---|
| 6 to 12 | motor cars, inclusive | .................................... | .15% |
| 13 to 24 | motor cars, inclusive | .................................... | .16% |
| 25 to 49 | motor cars, inclusive | .................................... | .17%) |

"Each percentage of discount as shown above will apply only to its specific quantity of motor cars, and will not apply on the preceding quantity unit.

"Terms of payment: The manufacturer will ship cars to the dealer with sight draft against bill of lading attached, and the dealer shall pay such draft with exchange upon presentation. Upon failure to do so, the dealer will pay interest thereon at the rate of 6% per annum from date of presentation. All prices are f. o. b. Detroit, Mich.

"Service stations: In the interest of more universal service to Dodge Bros. car owners, the manufacturers will appoint Dodge Bros. service stations wherever possible, and will sell repair parts for Dodge Bros. motor cars in the above territory as follows:

| | |
|---|---|
| To owner............................ | List price C. O. D. net. |
| To repair shops...................... | List price less 10% C. O. D. net. |
| To Dodge Bros. service station........ | List price less 15% C. O. D. net. |

"Repair parts discounts: The dealer's purchases of repair parts shall be billed to the dealer and be paid for by him at 25% discount from manufacturer's list price. To encourage the dealer to make prompt payment of his repair parts account, the manufacturer will allow the dealer a discount of 5% from the net price of all repair parts, if payment therefor is made on or before the 15th of the month following date of invoice.

"Deposit: To protect the manufacturer against nonpayment of such parts accounts, and to avoid the necessity of C. O. D. shipments, the dealer shall deposit with the manufacturer the sum of $1,000. At the expiration of this agreement, the manufacturer agrees to refund to the dealer the amount of this deposit, with interest at 6% per annum, after deducting therefrom any amount that may be due the manufacturer.

"Associate dealers: The dealer agrees to appoint associate dealers at all points in his territory necessary to meet the manufacturer's ideas of proper representation in all local communities. The manufacturer will help toward the appointment of associate dealers, with the understanding that the dealer will be held responsible for the acts of such associate dealer. In order to receive full benefit of advertising, publicity, and sales promotion, it is essential that all associate dealers' agreements be made on forms provided by the manufacturer, and that such agreements be forwarded to the manufacturer for approval.

"Territory infringement: The manufacturer appeals to the dealer's sense of fairness to prevent the dealer from selling Dodge Bros. motor cars for use in territory included in other Dodge Bros. dealers' agreements. If, however, there be any infringement brought to the attention of the manufacturer, the offending dealer agrees to immediately remit, without protest, to the manufacturer, the sum of $200, to be apportioned as seems fair and equitable, in the best judgment of the manufacturer.

"Report of sales: To assist in permanently increasing the dealer's earning capacity, and to assist the manufacturer to equitably distribute his product, the manufacturer requests the dealer to forward to him at Detroit the triplicate copies of all retail orders immediately upon being signed by the purchaser.

"Provision for cancellation: This agreement shall expire by limitation June 30, 1915, or may be canceled by the manufacturer or dealer upon fifteen days' notice. The termination or cancellation of this agreement will immediately act as a cancellation of all orders received from the dealer for motor cars or parts which have not been delivered prior to date of cancellation.

"Transfer of agreement: The dealer agrees not to transfer or assign this agreement without the written permission of the manufacturer.

"Claims for shortages and damages: To facilitate and expedite the adjustment of claims for shortages, the dealer agrees to make claims within ten days after the receipt of shipment. The manufacturer's responsibility ceases upon delivery to the transportation company, and all claims for damages should be made by the dealer direct upon the transportation company.

"Use of words 'Dodge Brothers': The dealer agrees to use the words 'Dodge Brothers' in advertising Dodge Bros. motor cars, but he agrees not to use the words 'Dodge Brothers' as a part of any corporate or firm name.

"Change in list price: The manufacturer reserves the right to change the list price of Dodge Bros. cars by giving the dealer 30 days' notice in writing.

"Dealer's order: The dealer authorizes the manufacturer to make shipment of Dodge Bros. motor cars in the quantities and according to the schedule printed below. The dealer agrees to accept and pay for such motor cars as shipped, and will not cancel any motor cars in this schedule without giving the manufacturer fifteen days' written notice, in which event the manufacturer will have the right to cancel a number of motor cars equal to those canceled by the dealer.

|      | Rds. | T. O. |      | Rds. | T. O. |      | Rds. | T. O. |
|------|------|-------|------|------|-------|------|------|-------|
| Oct. |      | 8     | Jan. | 2    | 19    | Apr. | 3    | 24    |
| Nov. | 2    | 7     | Feb. | 3    | 21    | May  | 3    | 30    |
| Dec. | 2    | 16    | Mar. | 2    | 25    | June | 3    | 30    |

"Repair parts stock: The dealer agrees to purchase from the manufacturer and to carry in stock at all times a stock of Dodge Bros. repair parts that will inventory at all times during the life of this agreement not less than $3,000 at list price. Upon termination of this agreement, the manufacturer agrees to purchase from the dealer any new Dodge Bros. repair parts in good condition that he may have in stock at that time, the dealer to prepay transportation charges on such parts to the Dodge Bros.' factory at Detroit.

"Display cars: In order to obtain the maximum retail business, the dealer agrees to keep in stock at all times at least one Dodge Bros. motor car for display purposes.

"Retail sales at list price: It is the intention of the manufacturer to at all times establish list prices which represent a fair value to the car owners and a legitimate profit to the dealer, discounts considered. Therefore the dealer should sell only at these list prices, to enable him to successfully conduct a permanent business.

"Warranty: The manufacturer warrants each new motor vehicle manufactured by him, whether passenger car or commercial vehicle, to be free from defects in material and workmanship under normal use and service, his obligation under this warranty being limited to making good at his factory any part or parts thereof which shall, within ninety (90) days after delivery of such vehicle to the original purchaser, be returned to him with transportation charges prepaid, and which his examination shall disclose to his satisfaction to have been thus defective; this warranty being expressly in lieu of all other warranties, expressed or implied, and of all other obligations or liabilities on his part, and he neither assumes nor authorizes any other person to assume for him any other liability in connection with the sale of his vehicles.

"This warranty shall not apply to any vehicle which shall have been repaired or altered outside of his factory in any way so as, in his judgment, to affect its stability or reliability, nor which has been subject to misuse, negligence or accident, nor to any commercial vehicle made by him which shall have been operated at a speed exceeding the factory rated speed, or loaded beyond the factory rated load capacity.

"He makes no warranty whatever in respect to tires, rims, ignition apparatus, horns or other signaling devices, starting devices, generators, batteries, speedometers or other trade accessories, inasmuch as they are usually warranted separately by their respective manufacturers.

"Policy: There are certain fundamental principles in business which should be observed by both the manufacturer and the dealer to insure permanent success. It is not the intention of the manufacturer to attempt to force the observance of these principles on the part of the dealer by virtue of this dealer's agreement, but rather to work with the dealer in an effort to bring about results mutually beneficial. If, however, the efforts of the manufacturer along this line meet with no responsive effort on the part of the dealer, the manufacturer will feel privileged to exercise his prerogative and cancel the agreement as provided herein."

The declaration alleges: That, although the defendant agreed to sell, ship, and deliver to the plaintiff 200 cars, as shown by the agreement between them, it failed to ship any cars in October, November, and December, 1914, although the agreement provided for the shipment of 4 roadsters and 31 touring cars during that time. That plaintiff was entitled to receive in January, 1915, 19 cars, while the defendant actually shipped, and the plaintiff received, only 7 cars. That plaintiff received only 3 of the cars called for by the contract in the month of February, although he was entitled to 21 cars. That of the 25 cars to be received in March he received only 9 cars, of the 24 cars for April he received only 20 cars, of the 30 cars for May he received only 20 cars, and of the 30 cars for June, 1915, the last month of the contract, he received only 5 cars; that is, the defendant shipped, and the plaintiff received, only 64 cars in all, and the defendant failed and refused to deliver the 136 cars, the difference between the number of cars delivered and the total number of cars called for.

The declaration then alleges that under the contract the plaintiff was entitled to certain discounts on all purchases of motor cars in

accordance with the schedule set out in the contract, and that the total amount of discounts which he would have been entitled to, if said 136 cars had been delivered to him, as required by the contract, is $21,006.60.

It is alleged that the cars were bought from the defendant for the purpose of resale in the city of Atlanta and in the territory described in the contract, and that the defendant well knew and understood this, and that the contract was entered into by the defendant for the purpose of introducing Dodge Bros. motor cars into the Atlanta market and the market in petitioner's territory named in the contract, and alleges that this was the first season during which Dodge Bros. motor cars had been manufactured and sold, and that Dodge Bros. selected the plaintiff and made the contract sued on in this case with petitioner in order to introduce and sell the Dodge Bros. cars.

The declaration then alleges that the defendant failed and refused to deliver the cars called for by the contract, and there was no market in which the petitioner could procure the Dodge cars, for the reason that no other manufacturer was manufacturing or could manufacture' Dodge cars, and there was no substitute that petitioner could procure or offer in the place of Dodge cars.

It is then alleged that the plaintiff could and would have sold the entire 200 cars called for by the contract if they had been delivered to him as provided; that, indeed, petitioner sold a large number of cars, accepting deposits thereon from the purchasers in order to bind the trades, and was afterwards compelled to return such deposits because of the failure and refusal of the defendant to furnish him the cars called for by his contract; that plaintiff did not stop taking orders for the cars until defendant's continued failure and refusal to furnish the cars called for by the contract made it a bad business practice for plaintiff and his salesmen to continue to take such orders and sell such cars.

Plaintiff then alleges that he spent a large amount of money advertising Dodge cars in Atlanta and the surrounding territory covered by his contract; that he leased and was maintaining, at No. 253 Peachtree street, Atlanta, Ga., a handsome showroom for said cars, together with a storage place for supply parts, and a repair shop and service station for said cars; that he had hired and maintained throughout the life of the contract a force of efficient and competent salesmen, and that he devoted almost all of his own time and attention to the business of selling Dodge cars and promoting the interests of Dodge Bros., the defendants; that with his own efforts, and the efforts of his force of efficient salesmen, and his advertising, he could and would have sold, not only the 200 Dodge cars called for by his contract, but the 50 additional cars which he asked the defendant to include in his contract at the time the contract was made.

It is then alleged that the plaintiff has been damaged to the amount of $21,006.60 by reason of the failure and refusal of the defendant, the said Dodge Bros., to deliver to him the said 136 cars in accordance with the contract, and he prays for judgment for that sum.

This is the substance of the first count in the declaration, and there

were three other counts in the original petition. In one of the paragraphs of the second count (paragraph 12) it is alleged that:

"Defendant frequently promised to comply with its contract with petitioner resulting from the acceptance by petitioner of defendant's offer to sell, but that defendant delivered only 64 of the 200 cars ordered from it by plaintiff, and failed and refused to deliver to plaintiff 136 of the cars ordered."

In the third count it is alleged, differing somewhat from the first count, that Dodge Bros. was anxious to have its cars sold in Atlanta and in the territory assigned to plaintiff under the contract, as well as elsewhere throughout the United States, and plaintiff was induced to enter into said contract by the assurances of defendant and its agents and representatives that it was ready, able, and willing to carry out the terms of said contract. It is then alleged that:

"Plaintiff deposited with defendant one thousand dollars in cash, provided for in said contract, and also incurred the following expenses and liabilities in order to place himself in a position for faithfully carrying out and performing his part of the contract." Plaintiff leased the property at No. 253 Peachtree street, Atlanta, Ga., at a cost of $210.60 per month; the total rental for the period covered by the contract between plaintiff and defendant being $2,316.60.

It is then alleged that the business of the National and the Haynes cars, carried on by plaintiff with the full knowledge, consent, and approval of defendant, occupied not more than one-fifteenth of all the space so leased by him, and all the rest of said property was leased for the purpose of being used in the business of selling Dodge motor cars, looking after their repairs, and furnishing them proper service.

It is then alleged that plaintiff furnished and stood ready to furnish practically all of his time and attention to the sale of Dodge motor cars, which he claims were to be delivered to him under his contract for sale in his territory; that he devoted to the business of the defendant all of the months of August, September, October, November, and December, 1914, and January, February, March, April, May, and June, 1915, except a small portion of said time, not exceeding one-twentieth thereof, and the value of plaintiff's time and attention to said business, with his skill and experience as an automobile man, was $10,000.

It is further alleged: That he employed a force of salesmen, and kept and maintained said force during the contract period, at a cost to him of $3,300. That he employed an office force, including stenographers and bookkeepers, for looking after the business he was going to do in Dodge motor cars if defendant carried out its contract and delivered cars in accordance therewith, which office force, so employed, cost him $175 per month, or a total of $1,925. That he established and maintained a service station, and laid in a stock of repairs, so as to operate a repair department for said cars, and established and maintained a shop for looking after the cars, all of which was done by petitioner at a cost to him of $3,000 during the life of the contract.

Plaintiff alleges that the above items of expense and cost, including the value of plaintiff's own time, were largely lost to him, to his great damage, because defendant failed and refused to deliver to him Dodge Bros. motor cars in accordance with its contract, and then alleges

237 F.—55

that the total costs and expenses incurred by him was $20,000 on account of this failure and refusal of defendant to live up to its contract and furnish plaintiff with the Dodge cars, and he prays judgment for this $20,000.

The fourth count in the declaration differs from the others, in that it is alleged that:

Plaintiff "deposited with defendant one thousand dollars in cash, provided for in said contract, and also incurred the following expenses and liabilities in order to place himself in a position for faithfully carrying out and performing his part of the contract, and, as shown by said contract, the said one thousand dollars was to be returned to petitioner, with interest thereon at 6 per cent. per annum, at the expiration of said contract on June 30, 1915."

By an amendment to count 1 plaintiff says that the contract was prepared by defendant, through its agents and attorneys, and was on a printed form purporting to be for use in making contracts between defendant and dealers in its cars.

Count 1 is further amended by alleging that defendant was informed, through its agents, that the said Pegram was going forward with performance under the contract, and was doing much work and incurring large obligations and making great expenditures in performing said contact, and that Pegram believed the contract to be a valid and binding obligation upon himself and said defendant, and defendant voluntarily received the benefits of such performance by Pegram, and at no time did defendant advise Pegram that it would not perform, or that the contract herein sued on was not a valid and binding contract.

The amendment to count 1 further alleges that defendant sought to excuse its failure to perform its contract by informing Pegram that, owing to the large number of orders received by it for its cars, and the inadequate facilities of its plant, a sufficient number of cars could not be manufactured to enable it to deliver to the said Pegram the cars provided for in the contract of July 26, 1914, and for the further reason that upon two occasions Pegram failed to accept promptly two shipments of defendant's cars, which was untrue in fact, and was a reason not assigned by defendant in good faith, and even if a breach by Pegram, which plaintiff denies, it was waived by both parties thereafter proceeding with performance under said contract; and plaintiff further alleges that defendant, prior to the bringing of this suit, assigned no other reasons for its failure to perform, and at no time prior to the bringing of this suit did defendant put Pegram upon notice that it contended the contract herein sued on was void for lack of mutuality, or for any other reason whatever, but, on the contrary, through the entire life of said contract, defendant knowingly allowed said Pegram to continue to perform, and accepted the benefit of his performance, and treated the contract as a valid, existing, and binding obligation.

The amendments to the other counts appear to be substantially those made to the first count.

There is a demurrer to the petition or declaration in this case, and it is to this demurrer that the present hearing is directed.

There are a number of grounds stated in the demurrer, the principal one being that this agreement is unilateral; that it lacks mutuality of promise and undertaking, in that the dealer agrees to receive the cars, but the manufacturer, the Dodge Bros., makes no promise on its part to deliver. This is fatal to this paper, which, as will be seen from the declaration, is the basis of the suit. Morrow v. Southern Express Co., 101 Ga. 810, 28 S. E. 998; Velie Motor Car Co. v. Kopmeier Motor Car Co., 194 Fed. 324, 114 C. C. A. 284; Oakland Motor Car Co. v. Indiana Automobile Co., 201 Fed. 499, 121 C. C. A. 319. But the fact that this contention of defendant is correct is conceded by the plaintiff's counsel in their brief, in which this is said:

"Defendant's counsel entirely misconceives plaintiff's argument. We have very earnestly insisted that we do not base our right to recover upon the theory that the agreement of July 29, 1914, was a mutual and binding contract at the time it was entered into. Notwithstanding our strenuous insistence upon the proposition that performance by Pegram accepted by Dodge Bros. has entirely altered the rights of the parties, counsel for defendant seems entirely to have overlooked the precise point in issue, and wholly to have misunderstood our position. We do not question the proposition of law stated by counsel for defendant under this head. We simply contend that they are wholly foreign to the issues in this case. In our former brief we have cited numerous cases where federal courts recognized the distinction which we have insisted upon, and have enforced contracts, even though originally lacking in mutuality, where a party not bound had in fact performed. This principle, that acting upon void acts or agreements gives them validity, has been applied, not only to uphold simple contracts, but also to render valid leases, bonds, judicial sales, judgments, etc."

So that we come to the proposition as to whether or not there has been such performance of the contract on the part of the plaintiff as would prevent the defendant, Dodge Bros., from setting up a lack of mutuality in the agreement between the parties. The agreement has the following provision:

"This agreement shall expire by limitation June 30, 1915, or may be canceled by the manufacturer or dealer upon fifteen days' written notice. The termination or cancellation of this agreement will immediately act as a cancellation of all orders received from the dealer for motor cars or parts which have not been delivered prior to the date of cancellation."

This provision would be fatal to this agreement, as a binding contract between the parties, if it was not otherwise objectionable. Velie Motor Car Co. v. Kopmeier Motor Car Co., supra; White Co. v. American Motor Car Co., 11 Ga. App. 285, 75 S. E. 345. It seems to me that, with this provision in the contract for its cancellation by either party, and without any reason given therefor, simply the right to cancel at will, it would be practically no contract at all. Even if there were an agreement here on the part of Dodge Bros. to deliver the cars, this right to cancel would seem to nullify any such agreement. To agree to do something and reserve the right to cancel the agreement at will is no agreement at all.

As I understand the contention of the plaintiff here, it is that his renting a store on Peachtree street, and employing salesmen and also an office force, was such compliance with the contract on his part as would estop the defendant from setting up lack of mutuality, and,

as I presume it is intended by the plaintiff, also from setting up the right to cancel in this proceeding. I am unable to agree with the plaintiff about this. The original declaration, as stated above, shows that the year during which this contract was to remain in force was the first season in which the Dodge Bros. motor cars had been introduced in this territory, and that the plaintiff's purpose was to resell the cars in Atlanta and the territory described in the contract. It seems to me that both parties must have entered into this contract, from its terms and what is generally stated in the declaration, with the knowledge that the business between them might not prove profitable, and therefore either party could end it at his or its option. It appears to have been an experiment as to how the Dodge Bros. cars would take and sell in this territory, and the contract was made accordingly. Why the plaintiff incurred the expense claimed, in view of the character of the agreement he had with the defendant, it is difficult to understand. He certainly was not justified in doing so by anything the defendant had undertaken to do, as I read the agreement.

I have gone through the authorities cited on this question pro and con, and I am unable to find any authority which would justify a recovery by the plaintiff in this case of the principal amount for which he sues.

Paragraph 7 of the fourth count of the original declaration alleges:

"Petitioner deposited with defendant the one thousand dollars in cash provided for in said contract, * * * and as shown by said contract the said $1,000 was to be returned to petitioner, with interest thereon at 6 per cent. per annum, at the expiration of said contract on June 30, 1915."

And in the eighth paragraph of the same it is alleged that:

"Defendant, the said Dodge Bros., has failed and refused to carry out said contract, * * * in that defendant has failed and refused to return to petitioner the sum of $1,000, together with interest thereon at the rate of 6 per cent. per annum," etc.

I see no reason whatever why this $1,000 was not returned to the petitioner. No excuse is given for it in the pleadings by the plaintiff, and the defendant relies on the demurrer, which, of course, admits everything well pleaded in the declaration to be true. I think the plaintiff is entitled to proceed in this case to recover the $1,000, which is still, according to the petition, in the hands of the defendant, and, unless some good defense is interposed, to the right to recover the same.

An order may be taken sustaining the demurrer, as indicated herein, and overruling it as to the claim of the $1,000.

Subsequent to the filing of the above it was shown to the court that the $1,000 had been returned by the defendant to the plaintiff, so that the demurrer to the entire declaration was sustained.