This action was before this Court, on appeal by the defendants from an order denying the petition and motion of defendants (481) for removal to the Federal Court, 180 N.C. 619. Defendants docketed the case in the Federal Court, and subsequently filed a bill in equity in that Court and procured an order enjoining the prosecution of this action in the State Court. Upon a hearing in the Federal Court, the injunction was vacated, and the suit dismissed. Thereupon, a consent order was entered remanding this action to the State Court, and the case was heard in the Superior Court of Buncombe County at the August Term, 1922. *Page 506 
The following stipulation was made by the parties in the case: It is agreed that this action was regularly and properly constituted in the Superior Court of Buncombe County, and that the summons was duly issued on 14 May, 1920, but not served, and a warrant of attachment was duly issued on the same day, and certain property in possession of the Southern Railway Company seized by the sheriff of Buncombe County thereunder, and that said warrant of attachment was discharged on 15 May, 1920, upon the defendants' entering an appearance and executing a bond in the sum of $7,500, conditioned as required by statute, and that it will not be necessary to print the summons, warrant of attachment, bond to discharge warrant of attachment, order discharging warrant of attachment, or other papers connected therewith, and which are not material for the determination of the questions involved in this appeal. Defendant, therefore, entered a general appearance and submitted to the jurisdiction of the court. Scott v.Life Association, 137 N.C. 515.
We deem it unnecessary to set out, in extenso, the contracts of the two companies, the Chevrolet Motors Company and the Chevrolet Motor Company of Atlanta, Ga., as it will suffice to state the reasons assigned by the defendants why the same are not enforceable, as this may sufficiently indicate the nature of the contracts, with the aid of the further statement below. But we will state what is tersely said by the defendants in their brief as to these contracts, and a subsequent oral contract supplementary thereto and amendatory thereof, which is as follows:
The instruments are the customary writings conferring the privilege of selling automobiles of a certain make within defined territory. There is no material difference in the two instruments. One confers the privilege in respect of the county of Henderson, and the other in respect of the city of Asheville. The plaintiffs did not rely solely upon these instruments at the trial. Their theory was that subsequent to their execution an oral agreement was made, and violated. In reviewing this judgment of nonsuit, the Court is chiefly concerned, we take it, with the inquiry whether it is permissible to deduce from the evidence, construed in a light most favorable to the plaintiffs, the inference that a binding contract was violated. If such conclusion may reasonably be (482) inferred, the judgment of nonsuit cannot be sustained. This was said by defendants.
In November, 1919, the individual plaintiffs were offered two agencies for the sale of the Chevrolet automobiles, trucks, and parts, one covering the counties of Buncombe, Madison, and Yancey, and to be known as that of the Erskine Motors Company, and the other covering the county of Henderson, and to be known as that of the Hendersonville Motors *Page 507 
Company. The individual plaintiffs agreed to accept the agencies, and they were, subsequently, to form corporations under the same names "to handle the Chevrolet automobiles and trucks," and when formed M. A. Erskine was to be president and J. V. Erskine was to be secretary, and the applications and contracts were signed in the agreed names by M. A. Erskine, president, before the charters were applied for, it being fully understood that no charters had been granted, and that the corporations were in "process of organization," to handle Chevrolet automobiles and trucks, and it was so written in the application.
Articles for the incorporation of the Erskine Motors Company and Hendersonville Motors Company were prepared, and a charter was granted to the Erskine Motors Company on 9 February, 1920, but the Hendersonville Motors Company never was incorporated. The Erskine Motors Company was incorporated subsequent to the breach of contract which is the basis of this suit.
Both of the contracts are dated 1 December, 1919, and were executed in behalf of the defendant Chevrolet Motor Company of Atlanta by M. J. Herold, sales manager, and in behalf of the plaintiffs by M. A. Erskine, president. At the time the contracts were executed, and as a part thereof, the plaintiffs gave shipping order for two hundred and seven (207) automobiles and trucks covering their requirements from December to July, inclusive, the last month being the end of the season in the automobile business. These orders were taken by the agent of the defendants, and payment of machines covered thereby was guaranteed by plaintiffs.
Soon after the contracts were entered into between plaintiffs and defendant, the Chambers Weaver Company, the former agent of the defendants, brought suit for damages on account of the agency being taken from it, and attached certain automobiles that had been shipped to plaintiffs under the contracts with plaintiffs. Plaintiffs notified the defendants of the attachment, and the attachment was discharged by defendants giving bond, and the automobiles were then delivered to plaintiffs. At that time plaintiffs were assured that they would experience no further trouble. On 18 December, 1919, M. J. Herold, the sales manager, arrived in Asheville, and expressed his regret that plaintiffs had had trouble with the first shipment of cars, and stated that plaintiffs should not be alarmed; that the arrangement (483) with Chambers Weaver Company had never been satisfactory, and that the attachment was one of the things they were doing to annoy defendants. A part of the conversation, as narrated by M. A. Erskine, one of the plaintiffs, is as follows:
"Mr. Herold talked to us at great length, and then I said to Mr. *Page 508 
Herold: `Mr. Herold, we hear it rumored in Asheville that there is some question as to whether or not we are going to keep these contracts or not.' He, Mr. Herold, replied to me: `Now, don't let that alarm you at all. We never had the representation in this part of the country that we should have had. We believe that after a thorough investigation that we now have the representation we are seeking, and the Chevrolet Motor Company of Atlanta has no idea of canceling your contract. The Chevrolet Motor Company is going to do everything in its power to assist you in making this business a success.' I said to him: `Mr. Herold, we haven't invested very much money in this business up to this time. Mr. Chambers of Chambers Weaver is a good personal friend of mine. I don't want to do anything against Mr. Chambers, and if he wants the contract and you will give it to him, I am perfectly willing to give it up.' I reached in my desk, took the contracts, handed them to Mr. Herold, and told him: `If we are going to be bothered with law suits and controversies, here are the contracts. You can take them. We are perfectly willing to lose what little money we have already put into this, but we don't want to go ahead any further with the idea of losing the contracts or with the idea of any controversy.' Mr. Herold said to me: `Mr. Erskine, I can assure you for the Chevrolet Motor Company that you will not lose the contracts, and that our relations with you are exactly what we have been seeking. We have investigated you thoroughly, and we are perfectly satisfied.' At that time my brother, John, spoke and said: `Mr. Herold, that is all right; that sounds good, but suppose we have the contracts and the cars are not shipped to us — the contracts would be no good.' He, Herold, said: `I want to assure you for the Chevrolet Motor Company of Atlanta that your contracts will not be canceled; that the cars will be shipped according to the schedule attached, and that we will take special pains in seeing that the parts you order are shipped promptly; in other words, the Chevrolet Motor Company is going to do everything in its power to make this agency a big success, and we want to cooperate with you in every way. I want to say to you for myself, personally, that I am the representative of the Chevrolet Motor Company of Atlanta, and that I will take a personal interest in your orders, and will see that everything you want is shipped to you promptly, and for the Chevrolet Motor Company, I want to tell you that we will ship everything according to (484) the schedule and you may rest assured that the Chevrolet Motor Company will furnish you the cars.'"
The original contracts between plaintiffs and defendants provide:
"(a) If for any reason we do not ship during the month any orders specified for that month, such unshipped or unfilled orders for that *Page 509 
month are automatically canceled and deducted from your allotment, thus releasing you and us from further liability on such unfilled orders.
"(b) All orders hereunder are given, taken, and accepted subject to the terms and conditions hereof, and in case of the cancellation of this agreement by either party each is thereby released from any liability to the other by reason of delay in or the nonfilling or nonshipping of any order outstanding at the date of such cancellation.
"(c) Either party may cancel this agreement by five days written notice to the other.
"(d) We are to use our best endeavors to fill orders with reasonable promptness, but no liability is to attach to us for delays of nondelivery or nonfulfillment of any orders."
"(e) Deliveries of all orders are subject to contingencies beyond our control, such as fires, strikes, embargoes, inability to secure material, labor, transportations, etc."
The plaintiffs were unwilling to incur the expense of renting a garage, employing salesmen and mechanics, and advertising and making other outlays in time and money unless and until they were assured that the contracts would not be canceled during the current automobile year, and that the automobiles and trucks which they had ordered would be delivered. The Chambers Weaver Company lawsuit, and the rumors that the agency might be taken from plaintiffs, caused plaintiffs to offer to surrender their contracts and to refuse to pay out any further amounts which would inure to the benefit of the defendants in the advertising of their automobiles, if plaintiffs might lose their profits by having the contracts canceled and by the defendants' failing to make shipment of the automobiles that had been ordered. The controversy emphasized the right of the defendants to arbitrarily cancel or to arbitrarily refuse to make shipment of automobiles under the original contracts; and plaintiffs were unwilling to go ahead unless the defendants would bind themselves not to cancel the contracts and to ship the automobiles and trucks already ordered for the months of January, February, March, April, May, June, and July, 1920. An oral contract was accordingly entered into on 18 December, 1920, whereby the defendants became bound to deliver to plaintiffs the automobiles that had been ordered by them for delivery during the first seven months of 1920, and on the faith of that contract the plaintiffs proceeded to give their time and to expend their money in establishing their business as agents of defendants, and in advertising the automobiles and trucks manufactured (485) by defendants.
In consequence of the oral agreement not to deprive the plaintiffs of the agency and to deliver to the plaintiffs the automobiles that had been *Page 510 
ordered for shipment in January, February, March, April, May, June, and July, respectively, as shown by the shipping orders, plaintiffs did all in their power to make their agency a financial success for the mutual advantage of both plaintiffs and defendants.
M. A. Erskine testified: "Mr. Herold said: `Go ahead, advertise, hire salesmen, get your advertising matter out, get your lease for your building.' We carried him out and showed him the building we were going to lease, and he said, `Go ahead, it's fine, take it.' One of the expenditures was the temporary lease for the building occupied by McFadden; then we negotiated for a permanent lease; I do not know when that was made. We had a contract with both the newspapers for advertising space, bought office supplies and fixtures, and completed financial arrangements with the bank to take out all cars arriving; employed salesmen, agreed with my brother in regard to salary he was to receive, and made all other financial arrangements necessary for the conduct of the business. . . . I have not given you the estimate of the actual loss of real money. It was approximately $8,000, composed of salaries, expenses, rent, advertising, and general operating expenses. The actual loss in salaries was $4,000 for salesmen under contract with myself, $2,400 for services; advertising, approximately estimated, $600; insurance, approximately $300; telephone rentals, clerk hire, etc. These estimates were made from December to July, six months, as the contract loss on the cars. The contracts with the salesmen were entered into for one year. For lack of funds we were forced to cancel these contracts at the expiration of ten months, and I am estimating on that basis. Business was so good and the prospects were so good that we ordered 67 cars in addition to those that Mr. Herold, as sales manager, had agreed to ship."
The defendants fixed the purchase price and sales prices of automobiles and trucks, and the compensation to plaintiffs was the difference between the purchase and sales price, and if the plaintiffs had received the automobiles specified in the "shipping orders" covering the months of January to July, 1920, inclusive, as agreed, the plaintiffs would have realized as gross profits thereon the sum of $29,780.21. There was a big demand for Chevrolet automobiles in the spring, summer and fall of 1920, and "there was no question but that the cars would have been sold promptly," and plaintiffs would have received the profits thereon from their customers. The market was so good that the supply of all makes was inadequate.
Defendant's manner of doing business was to ship carloads (486) of automobiles with bills of lading therefor attached to sight drafts, and all shipments had to be paid for before delivery. *Page 511 
After the oral contract of 18 December, 1919, was entered into, a second shipment of five automobiles was made to Asheville and delivered to plaintiffs on 23 December, 1919.
On 21 January, 1920, the defendants "arbitrarily and without reason canceled their verbal and written agreements," and refused to deliver the automobiles covered by the shipping orders, and on 2 February, 1920, the notice of cancellation was confirmed. The plaintiffs replied that they were surprised and disappointed at the action of defendants, and called attention to the fact that plaintiffs could not satisfactorily handle defendants' automobiles at Hendersonville if they were deprived of the agency at Asheville, it being fully understood that the Asheville and Hendersonville agency were to be carried on together, and that the Hendersonville agency was not profitable without the Asheville agency. Thereupon, defendants canceled their verbal and written agreements relating to the Hendersonville agency. Because of the wrongful cancellation of the oral contract, plaintiffs lost their time and approximately $8,000 in money expended by them in establishing the agencies, and had to seek financial assistance.
The defendant Chevrolet Motor Company is the parent corporation, and the Chevrolet Motor Company of Atlanta is the sales agent of the parent corporation in this territory, and Mr. Sills, the general manager of the parent corporation, in New York City, was the superior officer of Mr. Herold, the general manager of the Atlanta corporation, and plaintiffs made a statement of the facts in regard to the establishment of the Asheville agency by Mr. Herold, hoping that Mr. Sills would overrule Mr. Herold. This statement appears in the record as Exhibit "H." and was produced by defendants on the trial, and was read in part before the jury by defendants' counsel and frequently referred to in the cross-examination. It was introduced as evidence by plaintiffs. Defendants also sent a representation to New York to protest against the proposed action by Mr. Herold. In making the oral contract, Mr. Herold bound both corporations, and there was correspondence between plaintiffs and both corporations relating to the agency. Mr. Stocking, the factory representative of the parent corporation, carried on the preliminary negotiations resulting in the execution of the contracts, shipping orders, etc. P. C. Smith, supervisor of dealers for the parent corporation, made an investigation and report to them about the time defendants repudiated their contract with plaintiffs, and expressed himself as being satisfied with plaintiffs' organization. A report was made to the New York office when the agency was taken from Chambers 
Weaver Company and given to plaintiffs. After the cancellation, the parent corporation sent a check to plaintiffs on account (487) *Page 512 
of a deposit made with the Atlanta corporation at the time the original contracts were executed. Mr. Stocking was the factory representative of the parent corporation, and salesman of the Atlanta corporation.
At the close of plaintiffs' evidence the defendants jointly moved for judgment as of nonsuit, and the motion was allowed and judgment entered accordingly. Plaintiffs appealed.
After stating the case: The plaintiffs and defendants, as plaintiffs allege, or, at least, plaintiffs and defendant Chevrolet Motor Company of Atlanta executed certain paper-writings called contracts, which were so skillfully prepared by defendants, as contended by plaintiffs, as to inveigle plaintiffs into the belief that plaintiffs would be afforded protection thereby, and that they would be warranted in incurring the great expense necessary in advertising defendants' output and in establishing agencies for defendants in the designated territory. The efforts of a competitor to take the Asheville agency from plaintiffs caused them to examine the alleged contracts, and plaintiffs then became aware that the paper-writings did not constitute contracts, if defendants' contentions proved correct, and, therefore, that they were entirely at the mercy of the defendants. Huffman v. Page Motor Co., 262 F. 117; Adler v. Dodge Bros., 237 F. 860; Battle v. Smith, 113 S.E. (Ga.), 235, 239. When the plaintiffs realized that their agencies might be taken from them by defendants, at will, they offered to surrender the contracts without incurring further expense, but the general agent of defendants refused to accept the contracts, and assured the plaintiffs that the contracts would not be canceled, and agreed that the automobiles covered by the shipping orders for the months of January to July, 1920, inclusive, would be delivered as therein ordered. It was solely on the faith of this subsequent agreement that plaintiffs went ahead and gave their time and expended large sums of money in establishing the agencies, which were expected to be mutually profitable to plaintiffs and defendants. So confident were plaintiffs in the success of their undertaking that they bound themselves to take 67 automobiles in addition to those covered by the original shipping orders.
If the original contracts (Exhibits "A" and "B") were not binding, and the oral agreement of 18 December, 1919, was the first and only contract, or if Exhibits "A" and "B" did constitute obligations which *Page 513 
were modified and made certain by the subsequent oral agreement of 18 December, 1919, is not material. The defendants are (488) bound by the subsequent oral agreement of their general sales agent, whereby defendants modified the original contracts (Exhibits "A" and "B") and bound themselves to deliver the particular automobiles specified in the shipping orders, and at the time therein stated.Lane v. Engineering Co., 183 N.C. 307.
The plaintiffs refused to continue as agents of defendants, and to give the time and money required for the establishment of the agencies, unless the defendants would bind themselves to deliver the particular cars ordered for the months of January to July, inclusive. The consideration moving to the plaintiffs was the profits they would receive on those particular cars, and the considerations moving to defendants were the receipt by them of prices fixed for the cars, and the advertisement of their automobiles so that the demand for their output would be greater. Mfg. Co. v. McPhail,181 N.C. 205. The contract was not unilateral, a mere nudum pactum, but valid and binding, reciprocal duties and obligations being assumed by each side. The defendants obligated themselves to sell and the plaintiffs obligated themselves not only to buy at the prices fixed by defendants, but also to continue as agents of defendants for the sale of Chevrolet automobiles and trucks, and to rent a garage, employ mechanics and salesmen, advertise defendants product, and to do what was necessary for the mutual advantage of the contracting parties. Approximately $8,000 was expended by plaintiffs in establishing the agencies on the faith of the oral contract. This money was paid out by direction of defendants and for the benefit of defendants, and the only consideration therefor was the agreement of the defendants to deliver the automobiles and trucks that had been ordered. Now the defendants repudiate their contract, refuse to deliver the auomobiles [automobiles] and trucks, and insist that plaintiffs are without remedy, and that defendants can take the benefit of plaintiffs' time and money without giving anything in return. This position is one of the first impression, and is not supported by law.Holt v. Wellons, 163 N.C. 124. Plaintiffs contend that even if the oral agreement in controversy had been unilateral, the defendants would be bound, as they received the benefits of the consideration for which they bargained, viz.: the plaintiffs continuing as agents, and using their time and money in advertising and establishing the agencies. Richardson v. Hardwick, 106 U.S. 252; 27 Law Ed. 145; Stormv. United States, 94 U.S. 76; 24 Law Ed. 42. "If mutuality, in a broad sense, were held to be an essential element in every valid contract, in the sense that both contracting parties could sue on it, there could be no such thing as a valid unilateral or option *Page 514 
contract, or a contract to enforce a reward, offer, or a guaranty, or in many other instances occurring in ordinary business affairs. As a (489) unilateral contract is not founded on mutual promises, the doctrine of mutuality of obligation is inapplicable to such a contract. If the promisor has received a consideration, his promise is binding, and may be termed an obligation; but as there is no promise on the part of the promisee, there can be no mutual obligations. Accordingly, where one makes a promise, conditioned upon the doing of an act by another, and the latter does that act, the contract is not void for want of mutuality, and the promisor is liable though the promisee did not at the time of the promise engage to do the act; for upon the performance of the condition by the promisee, the contract becomes clothed with a valid consideration, which relates back and renders the promise obligatory. An option, supported by a consideration, furnishes another illustration of a contract, which is valid notwithstanding the lack of mutuality. It is no objection to the validity of the contract that the holder of the option is under no obligation to exercise it. Similarly the privilege of purchasing given a lessee, in case the lessor makes a sale of the premises, is not invalid on the ground that it is wanting in mutuality, since this privilege is part of the consideration for accepting the lease." 6 Ruling Case Law, p. 687, sec. 94. The measure of damages is the difference between the contract prices at which the automobiles were to be delivered to plaintiffs at Asheville and Hendersonville and the market value of the automobiles at those places during the period fixed by the contract for their delivery (Jeanette Bros. Co. v. Hovey,113 S.E. 665, 666), or to state it differently, and with the same result, the difference between the purchase prices as fixed by defendants and the sale prices as fixed by defendants.Hardware Co. v. Buggy Co., 167 N.C. 423; Steel Co. v. Copeland,159 N.C. 556.
The court below held that the original contracts are void and not enforceable as contracts, and that the oral contract is not binding because it is based on those paper-writings, which are of no effect, and dismissed the action.
Plaintiffs rely upon the reported cases, which show, as they contend, that retail automobile dealers have been repeatedly victimized in relying on "written contracts" (Exhibits "A" and "B") when in fact they were without protection, and in the instant case where defendants did bind themselves by a valid and enforceable oral contract and received the benefit of the time, labor, and money expended on the faith thereof, they should be required to answer in damages for losses sustained by plaintiffs on account of its wrongful breach by defendants.
It must be clearly understood that, in these various contentions of the *Page 515 
plaintiffs, they are not relying solely upon the original written contract, which contained the reserved powers of cancellation. It is not necessary for us even to pause in this discussion for the purpose of considering the validity of defendants' contention that they are (490) not, and neither of them is, liable for any breach of those contracts, for if there is such liability arising out of the subsequent oral agreement with Mr. Herold, as general agent of the companies, it is quite sufficient to dispose of the case adversely to the defendants' contention, for we are now dealing with a nonsuit; and the evidence must be taken in the most favorable view for the plaintiffs; and, furthermore, they are entitled to have us adopt, and act upon, any reasonable inference to be drawn from the evidence treated in that favorable light for them. No one shall be enriched by making another poor. If defendants received a benefit by reason of the services rendered by the plaintiffs, under a contract between them which defendants afterwards repudiated, or refused for any reason to perform, the plaintiffs may not recover on the special contract, because of its express terms, but the defendants cannot retain any benefit they have received and at the same time deny liability and refuse to pay anything, for this would be rank injustice, as said by the Court in Manhattan Life Ins.Co. v. Buck, 93 U.S. 24. This Court said, in Gorman v. Bellamy,82 N.C. 496: "The inclination of the courts is to relax the stringent rules of the common law which allow no recovery upon a special unperformed contract itself, nor for the value of the work done, because the special excludes an implied contract to pay. In such case, if the party has derived any benefit from the labor done, it would be unjust to allow him to retain that without paying anything. `The law, therefore, implies a promise,' say the Court, `to pay such remuneration as the benefit conferred is really worth,'" citing Dumott v. Jones, 23 How. (U.S.) 220; Monroe v. Phelps, 8 Ellis Black, 739. The same principle has since been frequently approved and applied in other cases by this Court.
Commenting on the Manhattan case, supra, Mr. Keener, in his excellent treatise on Quasi-Contracts (Ed. of 1893), p. 247, says: "Now it is submitted that no distinction can be drawn between Cutter v. Powell, 6 T.R. 230, and Manhattan Life Ins. Co. v. Buck, 93 U.S. 24. In each case there was an express condition to the effect that in the event in question the plaintiff should have no claim upon the defendant; in each case it is conceded that the plaintiff had no rights against the defendant on the contract itself. But by the terms of the contract, which provided that the plaintiff should have no rights on the contract in the event which has happened, it was distinctly stated in the case of *Page 516 Manhattan Life Ins. Co. v. Buck, supra, that the plaintiff was to have no rights of any kind against the defendant. If, then, the case of theManhattan Life Ins. Co. v. Buck, supra, is to be supported, it must be put upon the ground that the court will relieve against a forfeiture, and will therefore disregard a clause of the kind found in the (491) policy. But if the court will disregard such a clause in favor of a plaintiff who had paid money, the same court should certainly disregard the clause in favor of a plaintiff who has rendered services, since in the one case as much as in the other the defendant has received from the plaintiff that for which he has not given the plaintiff an equivalent."
But is not necessary that we adopt either of these views in the present instance, as the oral contract with Herold, the general agent or manager, so modifies the written contracts by eliminating the provisions as to cancellation, and in other respects, and his representations, promissory or otherwise, were of such a persuasive and tempting character, as to create a cause of action in favor of the plaintiffs, of quite a different kind from that which arose, if at all, upon the special written contract. To say the least of it, the language, conduct, and manner of Herold was calculated to impress the plaintiffs to believe that they could safely go ahead with their projected scheme as agents or distributors of defendants' cars and other vehicles, with the assured, and even warranted, expectation that the defendants would comply with their orders promptly and assist them in every way to success in their venture, which was to inure more to their benefit than to that of the plaintiffs. Stronger or more effective inducement could not have been held out to the latter, or have encouraged them in the belief, and even conviction, that they could safely make the anticipated expenditures in installing and equipping their plant at Asheville and Hendersonville upon the assurance of the defendants that they would get their money back thus laid out, and realize a substantial profit from the enterprise. If we should hold that plaintiffs have no legal right to be reimbursed for their outlay, under such circumstances, and to recover their reasonable and certain profit thus promised to them, would be to disregard all well settled principles of the law in like cases.
If one makes a promise to another which at the time of making it he does not intend to perform, and induces the latter thereby to part with value, or to act to his own prejudice, he will be liable for the consequent damages to him who is thus misled by the false promise. It has been held by us that in cases of fraud, where the person committing it has been thereby enriched to the damage or detriment of the other, an innocent party,indebitatus assumpsit will lie upon the ground that the law *Page 517 
implies a promise to restore what has been gained by the transaction.Armfield Co. v. Saleeby, 178 N.C. 298; 6 S.E. Digest 866. Another well established species of fraud by a vendee is purchasing with a positive intention not to pay for the goods. If such intention were known to the vendor he certainly would not sell. Its suppression, therefore, is a legal fraud. Benjamin on Sales (7 ed.), p. 470; Des Farges v. Pugh, 93 N.C. 31;Wallace v. Cohen, 111 N.C. 103; Donaldson v. Farwell, 93 U.S. 631;Stewart v. Emerson, 52 N.H. 301. The case of Rudisill v. (492)Whitener, 146 N.C. 403, approved the principle as stated. In Bigelow on Fraud it is said that, according to the current of authority, a debt is created by fraud where one intending at the outset not to pay for property induces the owner to sell it to him on credit by falsely representing or causing the owner to believe that he intends to pay for it, or by concealing the intent not to pay. A false and fraudulent representation or promise we understand to be one made with the intention in the mind of the promissor not to perform the promise. This is the misrepresentation of a subsisting fact, false within the knowledge of the party making it, and calculated to deceive. Speaking of an actionable fraud, Lord Bowen, in Edington v. Fitzminnia, 29 L. R. Chan. Div. 459, says: "There must be a misrepresentation of a subsisting fact; but the state of a man's mind is as much a fact as the state of his digestion. It is true that it is difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained, it is as much a fact as anything else. A misstatement as to the state of a man's mind is therefore a misstatement of a fact." Hill v. Gettys,135 N.C. 373, 375. Justice Ashe said in Des Farges v. Pugh, supra;
"It matters not by what means the deception is practiced — whether by signs, by words, by silence, or by acts — provided that it actually produced a false and injurious impression of such a nature that it may reasonably be supposed that, but for such deception, the vendor might never have entered into the contract." A promise is usually without the domain of the law unless it creates a contract, but if made, when there is no intention of performance, and for the purpose of inducing action by another, it is fraudulent, and may be made the ground of relief. Hillv. Gettys, 135 N.C. 375; Braddy v. Elliott, 146 N.C. 582. In the Hillcase, supra, the Court ordered the cancellation of a mortgage because of a fraudulent promise, and in the opinion quotes with approval the following excerpts from text-books and decisions: "The general rule in regard to promises is that they are without the domain of the law unless they create a contract, breach of which gives to the injured party simply a right of action for damages, and not a right to treat the other party as guilty of a fraud. But that proceeds upon the ground that *Page 518 
to fail to perform a promise is no indication that there was fraud in the transaction. There may, however, have been fraud in it, and this fraud may have consisted in making a promise with intent not to perform it. To profess an intent to do or not to do, when the party intends the contrary, is as clear a case of misrepresentation and of fraud as could be made." Herndon v. R. R., 161 N.C. 650-656; Williams v. Hedgepeth,184 N.C. 114; Tust Co. v. Yelverton, ante, 314. A promise is a solemn affirmation of the intention as to a present fact. 1 Bigelow (493) on Fraud, 484 (the author is discussing, of course, civil remedies). "When a promise is made with no intention of performing it, and for the very purpose of accomplishing a fraud, it is a most apt and effectual means to that end, and the victim has a remedy by action or defense." Goodwin v. Horne, 60 N.H. 485. "The intent is always a question for the jury, and to determine whether the intent was fraudulent the jury have necessarily to look to the circumstances connected with the transaction or those immediately preceding or following it."Des Farges v. Pugh, supra. This important question was fully considered in Massey v. Alston, 173 N.C. 215, and the principal authorities examined and cited by the Court. Mr. Bispham in his work on Equity (9 ed.), 211, deals with the subject from the standpoint of equity, and says regarding it: "The representation must not be an expression of intention merely. A man has no right to rely upon what another says he intends to do unless, indeed, the expression of intention assumes such a shape that it amounts to a contract, when, of course, the party will be bound by his engagement and for the breach of which the other side has, ordinarily, an adequate remedy at law. But if a promise is made with no intent to perform it, and merely with a fraudulent design to induce action under an erroneous belief, or if a representation amounts to a statement of fact, although dependent upon future action, in either case there is ground for equitable relief." Referring to that passage, it is said in Massey v. Alston, supra, that "Mr. Bispham is fully sustained in this view by the authorities he cites. As we are told by moralists and jurists, words are to be taken by courts of justice in the sense which it was intended they should be, and which those using them wished and believed that they would be understood by him to whom they are addressed, and the latter has the right to accept and act upon them as having such a meaning. The intention that he should thus understand them, and govern himself accordingly in his business intercourse with another who used them, is what gives a right to relief if it turns out that they are false, and if they induce the other party to act to his prejudice, relying upon the truth of what is said, in accordance with a fair and reasonable interpretation of the words. "If the defendant said *Page 519 
(as in Massey v. Alston, supra), that he would pay at once, or immediately, if the deed was delivered to him, and he had no intention of keeping his promise, and no ability to do so, as appeared in that case, and he made the false statement, dishonestly and for the purpose of getting possession of the deed, and thereby overreaching the plaintiff, knowing that plaintiff was trusting in his promise and its strict fulfillment, and gave up the deed because he did so confide in the defendant's integrity and in the belief that he would do exactly what he had promised, we cannot see why this is not such a false representation as would entitle (494) the plaintiff to relief. And the great weight of authority is to this effect."
Let us now apply these principles to the case in hand. If the defendants, acting through their general agent, having authority to bind the principals, represented what they would do, not intending at the time to do and perform what was promised, and thereby induced plaintiffs, relying on his statement, so to act as to bring loss upon themselves, if the promises and representations as to what would be done were falsely made, and were not carried out, and not intended to be executed, and plaintiffs were thereby made to suffer loss, the wrong was an actionable one, and they may recover for the loss or injury resulting therefrom. Both law and equity will afford relief in proper cases.
Or if the defendants, by themselves or their duly authorized agent, made promises or representations, upon which the plaintiffs had the right to rely, and they were misled thereby to their prejudice, they may recover the resulting loss.
The defendants further contend that there is no mutuality, as between the parties to the contract, which they say means no consideration to support it as an enforceable agreement. But there is such consideration, it being the benefit and advantage defendants were to receive from the wide advertisement and sale of their cars, and from other advantages, which they were so keenly anxious to reap, as their agent intimated, and furthermore, as a part of the consideration, they were to have the services, efforts, and expenditures of the plaintiffs in that behalf. What more would they want or could they require? Besides all this, there was mutuality and consideration sufficient to uphold the contract, as defendants were not only to lay out large sums of money in preparation for the fulfillment of their agency to sell the defendant's cars, but were to pay the scheduled prices, or in default of that, the reasonable prices of the defendants for the same. It must be kept in mind that plaintiffs are not relying altogether upon the written contracts, as amended subsequently, but upon the oral representations and promises of the defendants, by which they were deceived and thereby lost. Plaintiffs were *Page 520 
to pay the list prices, subject to changes of the same according to the rise or fall of prices in the market, but still they were to pay. The cars were to be shipped "according to schedule attached," and Herold said, with impressive words and manner, "We will take special pains in seeing that what you order is shipped promptly, and the company agrees, through me, to do everything, in its power, that will make this agency a big success, and we will cooperate with you in every way to that end." These were not only impressive words, but calculated to inspire the plaintiffs with confidence in their truth, and sincerity, and to induce a free expenditure of their money and effort in producing the (495) desired and promised result.
Where no time is fixed, if it is not fixed here, for the performance, duration, and completion of the contract, the law implies that a reasonable time will be allowed. Winders v. Hill, 141 N.C. 694; Michaelv. Foil, 100 N.C. 178; Bunch v. Lumber Co., 134 N.C. 116; Waddell v.Reddick, 24 N.C. 424.
The orders for cars were given by plaintiffs in reliance upon the representations and promises of Herold, the defendants' general agent, and not necessarily upon the written contracts, unmodified by the oral agreement, or even as modified by it, as there are considerations, independent of the written agreements, upon which the oral agreement may well rest.
The agreement is not affected by the statute of frauds, the two cases relied on by defendants for the suggestion as to the statute, viz., W. CityFire Ins. Co. v. Lichtenstein, 181 A.D. (N.Y.) 681, 685; Pearlberg v.Levischn, 112 Misc. (N.Y.) 95, were both decided in New York, the statute of that State and ours being essentially different as to contracts not to be performed within a year, and in other respects.
The position that the contracts were executed in the name of the plaintiffs as individuals seems to be untenable, if not trivial, the intention manifestly being that the plaintiffs should act individually until their incorporation. This objection is more technical and formal than substantial. It does not prejudice the defendants materially that the incorporation of plaintiffs has been delayed. It may be that the incorporation might take place now, and the corporations made parties, as successors to the individual plaintiffs. We do not see how the merits of the transaction will be materially affected either way. The Code provides, Pell's Revisal, sec. 415: "No action shall abate by the death, marriage, or other disability of a party, or by the transfer of any interest therein, if the cause of action survive or continue, but the Court, on motion at any time within one year thereafter, or afterwards on a supplemental complaint, may allow the action to be continued by or against his representative or successor in interest." It is plainly evident *Page 521 
that this contention must have been an afterthought of the defendants, and not the substantial reason for the failure to comply with their contracts.
We have thus carefully considered all reasonable grounds of objection set up by the defendants, and find none of them to be tenable. The rulings of the Court are consequently reversed, and the nonsuit is set aside. This necessitates the calling of a jury to try the case.
New trial.
ADAMS, J. This opinion was written by Mr. Justice Walker in accordance with the decision of the Court, and was filed after his death.
Cited: Erskine v. Motors Co., 187 N.C. 829; Williams v. Williams,220 N.C. 811; Metals Corp. v. Weinstein, 236 N.C. 561; Rubber Co. v.Distributors, 253 N.C. 467.