M. R. RUDISILL v. A. A. WHITENER.

(Filed 14 December, 1907).

1. Contract—Specific Performance—Fraud in Factum—Fraudulent Representations—Defenses.

There is a distinction between the defense to an action to enforce specific performance of a contract, and to rescind and set it aside for fraud in the *factum* or treaty. Hence, when the pleading and evidence show that the former defense is being made, it is error for the court below to restrict the issue to the second defense.

2. Contract — Specific Performance — Fraudulent Representations— Intent.

Evidence tending to show that the defendant was induced to make and execute a contract to convey land, the subject of the suit for specific performance, by the false representations of plaintiff that, as a part of the consideration therefor, he would

transfer to defendant an option he held on another lot of land which defendant desired, if he concluded not to buy it, when he had already concluded to buy it, is available as a defense.

**3. Same—Specific Performance—Defense—Consideration—Option—Promise.**

In an action to enforce specific performance of a contract to convey land the defendant may show by parol that the words and acts of plaintiff were such as to reasonably induce him to believe that, as a part of the consideration for the contract, he would transfer to him an option he had on a different lot of land which he desired. Actual fraud is unnecessary to be shown.

**4. Actions—Form, Legal and Equitable—Issues—Courts—Administration.**

The abolition, by the Constitution, of the distinction between actions at law and suits in equity does not destroy equitable rights and remedies; and the issues should be so framed as to clearly present the matters in controversy, so that, upon the verdict, the court, subject to review upon appeal, can apply equitable rules and principles.

CIVIL ACTION, tried before *Guion, J.,* and a jury, at June Term, 1907, of the Superior Court of BURKE County.

This was an action to compel specific performance of a contract to sell land. The plaintiff alleged that, on 6 October, 1905, the defendant executed and delivered to him the following paper-writing: "Received of M. R. Rudisill ten dollars, part payment on my farm, which I agree to sell him for two thousand dollars, and to make him a good and lawful deed, on or before 1 January, 1906, upon payment of balance of two thousand dollars. This 6 October, 1905. (Signed) A. A. Whitener." Plaintiff alleged that he had tendered the balance of the purchase money within the time named, and demanded a deed for the land. The defendant declined to accept the money or execute the deed. He demands judgment, etc.

Defendant admits the execution of the receipt, and alleges that he was induced to execute the same by the promise of plaintiff to transfer and deliver to him an option, which plaintiff then held, to buy a tract of land known as the

Sigmon land; that plaintiff, at the time, and in considera-
tion of the execution of said receipt, executed and delivered
to him the following paper-writing: "I hereby agree to turn
over to Dolph Whitener the option I have on the Sigmon
land before the twenty days run out, if I decide to have
nothing to do with the buying it; and, in case I turn over
the option, then Dolph Whitener agrees to let M. R. Rudisill
have the roughness on my place free of charge; otherwise,
the roughness is not turned over to Rudisill.   This 6 October,
1905.  (Signed) M. R. Rudisill."  Defendant alleges that
"he is a man of considerable age and cannot read writing at
all without the use of glasses, and, being an illiterate man,
cannot read well even with the aid of glasses; that the paper
was not read correctly to him, but was so read as to induce
him to believe that it was an absolute and unconditional
agreement to transfer to him the option on the Sigmon land;
that he accepted the sum of $10, and signed the receipt by
reason of the positive agreement with plaintiff that he would
transfer to him the Sigmon option.   Defendant testified that
he agreed to sell his land to plaintiff, only with the under-
standing that plaintiff would surrender to him the option on
the Sigmon land; that plaintiff said he would send the de-
fendant the option in a few days—"in plenty of time for me
to get my deed from Sigmon."   Defendant was corroborated
by his wife.   He said that he was willing to convey the land
if plaintiff would transfer the Sigmon land to him.

Plaintiff testified that he had an option to buy the Sigmon
land at the price of $2,500.   He said that defendant wanted
the Sigmon land if he sold his own.   "On the day the papers
were signed I said: 'I will tell you what I will do: I will
turn it over unless I conclude to buy.'  He said: 'No; then
you want to take my place and not let me have the Sigmon
place.'  I said: 'Well, the best I can do is to agree that, if I
don't decide to buy, I will turn it over to you.'  And we then
had the papers drawn up and signed.   He took one, and I the

other. He seemed satisfied when he got the agreement. He seemed to think I would not take the Sigmon land and I would take $100 for the option. I rather thought I would buy, but I had not made up my mind. We had never fully decided to take the Sigmon land that day. I think it was understood we should take it."

Mr. Aderholt, witness for plaintiff, who wrote and witnessed both papers, testified that he read them correctly to defendant. "At the time the papers were signed we all knew that Whitener wanted the Sigmon land and that he would give $100 for the option." He further testified: "It was understood between plaintiff, M. E. Rudisill and me that, if plaintiff bought both Sigmon and Whitener tracts, M. E. Rudisill and myself would become partners with him in the trade, as he said he could not buy both places without help. This (was) understood before the papers were signed."

There was other testimony, but the foregoing is sufficient for the purpose of passing upon the single exception in the record.

His Honor submitted the following issues:

"1st. Did defendant, in violation of his contract, fail to execute and deliver to plaintiff a deed for the lands described in the complaint?" Answer: "Yes."

"2d. If so, what damage has plaintiff sustained by reason thereof?" Answer: "None."

"3d. Did plaintiff wrongfully fail to transfer to defendant the option on the Sigmon land, referred to in the answer?" Answer: "No."

"4th. If so, what damage has defendant sustained by reason thereof?" Answer: "None."

Defendant, in apt time, requested his Honor to charge the jury that, "if they should be fully satisfied from the evidence that when the defendant signed the agreement to convey, he was reasonably induced by the words and acts of the plaintiff to believe that the plaintiff was going to transfer to defendant

the Sigmon option, and on account of such belief signed the contract sued on, they should answer the first issue 'No.'"

The court declined to give this instruction, holding that the inquiry was limited to whether or not Aderholt read the papers to defendant as they were written, as testified by him, or otherwise, as alleged in the answer and testified by the defendant.

Defendant excepted. There was judgment upon the verdict that defendant execute a deed to plaintiff for the land upon the payment of the balance of the purchase money. Defendant appealed.

*Avery & Ervin* and *M. H. Yount* for plaintiff.
*Self & Whitener* and *S. J. Ervin* for defendant.

CONNOR, J., after stating the facts: His Honor inadvertently failed to note the distinction between a suit brought to rescind and set aside a contract on the ground of alleged fraud in the *factum,* or in the treaty, and one in which defendant is resisting a bill for specific performance, without drawing into question the validity of the contract. He unduly narrowed the scope of the defense. If, for instance, Whitener had sued plaintiff to rescind the contract for that his signature was obtained by fraud, in that it was read to him incorrectly and its true contents suppressed, the instruction asked could not have been given. The defendant, it is true, makes that charge, but in one aspect of his answer his defense is based upon the contention that, taking the contract as written, he was induced to sign the receipt and the agreement to sell his land upon the express promise and assurance by the plaintiff that he would, in consideration and as a part of the transaction, transfer to him the option which plaintiff held on the Sigmon land. The two papers constituted but one transaction, or agreement, and should be read together. They were written, signed and delivered simultaneously. Thus read, they constitute mutual covenants. The defendant agrees to sell his land, and the plaintiff agrees to transfer the

Sigmon option, if he decides not to buy himself. The paper-writing, read in the light of the treaty, clearly represents that plaintiff is uncertain whether he will buy the Sigmon land—that, in good faith, he is considering the question. If in truth he had, at the time he signed the paper, determined in his own mind that he would buy the land, and did not intend to let defendant have it, and he induced defendant to believe that he was considering the question of buying, certainly a court administering equitable relief, upon well-settled equitable principles, would not interfere, but would leave plaintiff to his action for damages. While it is true that a provision to do something in the future is not a misrepresentation of a fact, it is equally true, both in morals and equity, that, if one make a promise which he knows at the time he will not perform and has no intention of making good, he acquires no enforceable right against another, who honestly relies upon the promise. This is true when the contract is partially executed. If one, being insolvent, conceals his condition and promises to pay for goods with a preconceived purpose not to do so, no title will pass to him. *Wilson v. White,* 80 N. C., 280. In *Des Farges v. Pugh,* 93 N. C., 31, *Ashe, J.,* says: "It matters not by what means the deception is practiced—whether by signs, by words, by silence, or by acts—provided that it actually produce a false and injurious impression of such a nature that it may reasonably be supposed that, but for such deception, the vendor might never have entered into the contract." While it is difficult to show the state of a man's mind, if, by his acts and conduct it can be ascertained, it is as much a fact as the state of his digestion. *Hill v. Gettys,* 135 N. C., 373. If, therefore, at the time plaintiff signed the paper by which he agreed to transfer the option on the Sigmon land to defendant if he concluded not to buy it himself, he had determined to buy it, or, as he says, "it was understood" that he would buy it, we think that, whether or not it was sufficient to rescind an executed contract, such fact is available to de-

fendant in this action, wherein the plaintiff is invoking specific performance.  The defendant is not driven to the proof of actual fraud, but may, by parol, show that he was induced by the words and acts of the plaintiff to believe that he would transfer to him the Sigmon option.  This was a question for the jury.  It is well settled—and we have no disposition to trespass upon the principle—that, "When the contract is in writing, is certain in its terms, is for a valuable consideration, is fair and just in all its parts and is capable of being enforced without hardship to either party, it is as much a matter of course for a court of equity to decree its specific performance as for a court of law to award damages for its breach." 4 Pom. Eq., sec. 1404.  "This right, however, is controlled by other equities."  Bispham Eq., sec. 364.  It will not be enforced "where the complainant does not come with clean hands or when equities exist on the other side which would render it unjust to grant the relief" (*ib.,* 376), "or it is not clear that the minds of the parties have come together.  The contract must be free from any fraud or *misrepresentation, even though not fraudulent,* mistake or illegality.  The contract must be perfectly fair, equal and just in its terms *and in its circumstances."*  Pom., sec. 1405.  That actual fraud need not be shown to resist a decree for specific performance is established by abundant authority.  *Romilly, M. R.,* in *Baskcomb v. Beckwith,* 8 L. R. Eq. Cas., 100, said: "Specific performance of a contract will not be enforced when defendant has contracted under a mistake, to which plaintiff has by his acts, even unintentionally, contributed."  The learned Judge says: "It is of the greatest importance that it should be understood that the most perfect truth and the fullest disclosure should take place in all cases where the specific performance of a contract is required, and that, if this fails, even without any intentional suppression, the court will grant relief to the man who has been thereby deceived, provided he has acted reasonably and openly."

Professor Eaton says: "When the aid of a court of equity is sought by way of specific performance, the principles of ethics have a more extensive sway than when a contract is sought to be rescinded. When a party calls for specific performance, he must, at every stage of the transaction, be free from imputation of fraud or deceit and show that his conduct has been honorable and fair." Eq., 270. In *Woolam v. Hearn,* 7 Ves., 211 (2 White & Tudors L. C., 491), *Sir William Grant* says: "When equity is called upon to exercise its peculiar jurisdiction by decreeing a specific performance, the party to be charged is let in to show that, under the circumstances, the plaintiff is not entitled to have the agreement specifically performed, and there are many cases in which parol evidence of such circumstances has been admitted. * * * Where the terms of a written agreement have been ambiguous, so that, adopting one construction, they may reasonably be supposed to have an effect which the plaintiff did not contemplate, the court has, upon that ground only, refused to enforce the contract." *Calverley v. Williams,* 1 Vesey Jr., 201. "Nor will a court of equity enforce a contract according to its terms, when to do so would violate the real object of the contract in the minds of the parties when the contract was made, and produce a result not contemplated at the time of the execution of the agreement." 26 Am. and Eng. Enc., 68. The decisions of this Court are in harmony with the doctrines of equity in this respect. In *Leigh v. Crump,* 36 N. C., 299, *Gaston, J.,* discussing a bill for specific performance, says: "We entirely acquit the plaintiff of intentional misrepresentation. And we hold that defendant has not shown that the plaintiff made any representation * * * variant from that which is set forth in the written contract." He further says that there is nothing in the evidence which would bar an action for damages, where the actual damage could be recovered: "But he has preferred to ask the aid of a court of equity to carry the contract into execution. The specific exe-

cution of a contract in equity is not a matter of absolute right in the party, but of sound discretion in the court. An agreement, to be carried into execution there, must be certain, fair and just in all its parts. Although it be valid at law, and, if it had been executed by all the parties, it could not be set aside because of any vice in its nature, yet, if its strict performance be, under the circumstances, harsh and inequitable, a court of equity will not decree such performance, but leave the party to his legal remedy." In *Loyd v. Wheatly,* 55 N. C., 267, *Battle, J.,* citing *Leigh v. Crump,* says: "Even the mere fact that the contract is a hard one, and would press heavily on the defendant, will induce the court to withhold its aid and leave the plaintiff to his remedy at law.  *  *  * We do not declare that it was obtained from the defendant by fraud.  *  *  * The agreement is not, in our opinion, certain, fair and just in all its parts, and we cannot, therefore, declare its enforcement in this Court." In *Cannady v. Shepard,* 55 N. C., 224, *Nash, C. J.,* discussing a bill for specific performance, says: "The contract was not fair. The defendant was made to believe that the agreement as to the purchase of the land was binding upon him. The contract was hard and oppressive on the defendant. There is no equity in the claim of the plaintiff." *Love v. Welch,* 97 N. C., 200; *Ramsey v. Green,* 99 N. C., 215. Numerous cases may be found in the reports in which relief has been denied upon the ground that the contract is harsh, uncertain, unjust, oppressive, regardless of actual fraud. An examination of the testimony of both plaintiff and defendant discovers ample evidence that Whitener never intended to sell his home unless he got the Sigmon land, near by. Mr. Aderholt, plaintiff's witness, who wrote the papers and witnessed them, and who, although not told to Whitener, was to have an interest in the land, says: "We knew that day that, if Whitener sold his tract, he wanted the Sigmon land and the option, but I do not know that he understood that day that he would get it;

that Rudisill told him that he would have to go home and decide, before he could tell him if he would turn over the option." Plaintiff says: "We had never fully decided to take the Sigmon land that day. I think it was understood we should take it. They (M. E. Rudisill and Aderholt) said *that day* they would help me buy it, and I thought *that day* we would buy it." M. E. Rudisill, who was present and heard the conversation, said that plaintiff positively refused to sell the option: "Brother, Aderholt and myself own one-third each in the Sigmon land and are to be equally interested in the Whitener land." Defendant says: "They knew that day that I wasn't going to sell my place unless I could get the Sigmon place, and the agreement was that I was to have the option. They knew I wouldn't trade unless I got the Sigmon place. * * * I told them afterwards that I was still willing to sell if I could get the Sigmon land." His wife says that she heard her husband say: " 'You have got your hands on the only land my wife will go to.' Then Aderholt said, 'What will you give us for the option on the Sigmon land?' My husband answered, 'One hundred dollars, or the roughness on my place.' Aderholt was drawing the papers, and then it was my husband came in and said we were to get the Sigmon land. I am willing to stand by the agreement if they will.' " There is evidence on the part of the plaintiff tending to show that plaintiff, his brother, M. E. Rudisill, and Mr. Aderholt, his brother-in-law, had, at the time the papers were signed, an understanding that they were to buy both the Sigmon and Whitener lands. We do not hold that in order to make a valid contract they were under any legal obligation to tell this to Whitener, but it is manifest that they knew that if they did tell him the exact state of their minds, their understanding and purpose, he would not enter into the agreement.

It is not necessary to suggest that the paper was not correctly read to defendant. The evidence does not create the

impression on our minds that it was incorrectly read, but the entire evidence strongly tends to show that defendant was induced by the acts and declarations of plaintiff to believe that he was to get the Sigmon option, and thereby secure another home, if he parted with the one which he then had. If, upon an appropriate issue, the jury so find, he should not be compelled to convey his home to plaintiff. The jury may well say, as was said by *Judge Gaston,* "We acquit the plaintiff of actual misrepresentation," but we find that the contract, in the light of the status of the parties, their acts and declarations, was not "certain, fair and just in all its parts." If they so find, the court, administering equity in accordance with an enlightened standard of morals applied to the daily transactions of men, will not compel performance on one part and permit the plaintiff to refuse to transfer the Sigmon land. The true principle is well stated by defendant's wife when she says: "I am willing to stand by the agreement if they will." The jury find that no damage is sustained by the refusal of defendant to execute the deed. An impression has prevailed to some extent that, because "The distinction between actions at law and suits in equity is abolished" by the Constitution, equitable rights and remedies are thereby destroyed. This Court has uniformly held that no such result follows the change in the forms of procedure. *Ely v. Early,* 94 N. C., 1; *Boles v. Caudle,* 133 N. C., 528, and many other cases.

It is sometimes difficult to so frame issues for the jury that equitable rights and principles are presented. The purpose of the reformed procedure certainly was not to destroy or impair those rights and remedies which the experience of the ages had shown to be essential to a system of enlightened jurisprudence. Professor Pomeroy, in his admirable work on "Code Remedies," says that the difficulty of administering legal and equitable remedies in one form of action has been experienced in the "Code States," and that "The same difficulty presented itself to the advocates of the new procedure

in England while the measure was pending in Parliament; it was obviated by inserting in the 'Supreme Court of Judicature Act' the following clause: 'Generally, in all matters in which there is any conflict between the rules of equity and the rules of the common law with reference to the same matter, the rules of equity shall prevail.' " In this case the issues do not very clearly present the matters of fact in controversy and upon which the judgment of the court should rest. It cannot be that the question whether the contract is one which a court of equity will enforce specifically is to be decided by the jury. The ultimate decision of the case is to express, not the arbitrary discretion of the Judge, but the sound judicial discretion, guided by the principles and rules which have heretofore been adopted and applied by chancellors in similar cases. The judgment is, of course, subject to review by this Court. We would suggest that, upon another trial of this cause, the question presented by defendant's prayer for instruction be submitted in the form of an issue, or question of fact.

There must be a
New Trial.