## CAMP MFG. CO., Inc., v. JORDAN et al.

(District Court, E. D. North Carolina. September 3, 1923.)

No. 491.

1. **Evidence ⬤⇒418—That one contracting to sell timber was acting for undisclosed principal may be shown by parol.**

If one contracting to sell standing timber was acting for undisclosed principal, this fact might be shown by parol evidence.

2. **Principal and agent ⬤⇒175(2)—Sale of timber without authority may be enforced when principals ratified act.**

If one contracting to sell standing timber was acting without authority, but owners, with notice of his assumed agency, ratified his act, performance of the contract might be enforced against them.

3. **Specific performance ⬤⇒64—Contracts for sale of standing timber subject to same rules as contracts for sale of soil.**

Standing timber constitutes essential element of real estate, and right to enforce specific performance of executory contracts for its sale is based upon and subject generally to same rules and limitations as contracts to convey the soil.

4. **Specific performance ⬤⇒15, 28(1), 32(1), 49(1)—Contract must be based on consideration, be mutual, and its terms must be certain, and its enforcement practicable.**

To authorize specific performance, contract must be based upon valuable consideration, its terms must be certain, and its enforcement practicable.

5. **Specific performance ⬤⇒28(2)—Unsigned memorandum and signed agreement held to be construed together and to constitute option.**

Unsigned memorandum for sale of standing timber at specified prices per thousand feet, and signed agreement prepared at the same time and providing that seller could take three tracts at prices fixed by such memorandum and quantities as estimated by seller, and that, if seller and buyer's representative could agree on estimate as to two other tracts, it should be optional with buyer to take them at the price fixed, should be read together in determining whether contract is sufficiently certain for enforcement, and constituted option for sale of the timber when its quantity was ascertained by methods set forth.

6. **Specific performance ⬤⇒39—Memorandum must be sufficiently specific to satisfy statute of frauds.**

Memorandum of sale of standing timber must be sufficiently definite in its essential elements to comply with requirements of statute of frauds (C. S. N. C. § 988), to enable court to decree specific performance, but latent ambiguities may be explained by parol evidence.

7. **Specific performance ⬤⇒121(9)—When writing provided for agreement as to quantity of standing timber, it must be shown to court's satisfaction.**

When memorandum of sale of standing timber at specified prices per thousand feet provided that as to three tracts seller's estimates should be accepted and, as to two other tracts, contemplated that seller and buyer's representative should agree on estimate, agreement on the quantities must be established by preponderance of the evidence sufficient to satisfy court that minds of the parties met upon essential terms sufficiently certain and definite, to enable court to decree its performance.

8. **Specific performance ⬤⇒121(1)—Not decreed when mind left in doubt on parol evidence.**

When parties to alleged sale of standing timber left the agreement partly in parol, the court must consider every fact and circumstance prior to, at time of, or subsequent to, alleged agreement, and if, after so doing, its

---

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

mind is left in doubt as to what was said and done or what was intended, it will decline to decree specific performance.

9. **Specific performance** ⊂⊃119—Where there is dispute as to boundary and no evidence as to true location, specific performance cannot be decreed.

Conceding that there was agreement for sale of standing timber at specified price per thousand feet on basis of 7,500 feet per acre with number of acres to be ascertained by survey, where dispute subsequently arose as to boundary lines and there is no evidence as to correct lines, specific performance cannot be decreed.

10. **Tenancy in common** ⊂⊃43—Tenant cannot sell cotenant's interest.

There is no unity of title between tenants in common, and one tenant has no power to contract for sale of his cotenant's interest in land owned in common.

In Equity. Bill by the Camp Manufacturing Company, Incorporated, against Sarah Ella Jordan and others for specific performance of executory contract for sale of standing timber. Bill dismissed.

J. C. Parker, Jr., of Franklin, Va., T. D. Savage, of Norfolk, Va., and W. D. Boone, of Winton, N. C., for plaintiff.

Stanley Winborne, of Murfreesboro, N. C., and C. Wallace Jones, of Winton, N. C., for defendants.

CONNOR, District Judge. Plaintiff is a corporation chartered and organized pursuant to the laws of, and having its principal office in, the state of Virginia, engaged in purchasing timber and manufacturing it into lumber for sale. Defendants are residents of the Eastern district of North Carolina.

Defendant Sarah Ella Jordan is, and was on and prior to July 1, 1922, the owner of two tracts of land situated in Hertford county, N. C., known and described in the bill herein as the "Bartonsville tract" and the "Samuel Barnes tract," respectively.

Defendants John R. Jordan and William M. Jordan are the owners, as tenants in common, of three tracts of land in said county, known and described in the bill as the "Gatling tract," the "Lowe tract," and the "Jenkins tract," respectively, and more particularly described in the bill.

On each of said tracts there are standing and growing valuable timber trees. On May 25, 1922, P. D. Camp, the president of plaintiff company, addressed a letter to defendant John R. Jordan, referring to the receipt of a letter from said Jordan advising the company that "you are going to sell the timber on the Bartonsville, Barnes and Gatling farms," and requesting that he "let us have price on each one of these tracts, etc."

On the same sheet defendant Jordan acknowledged receipt of the letter and wrote:

"We haven't made price on these lots of timber. I will be in your city one day next week. If you will have this timber estimated you will know how much there is and make me a price that day."

Several letters passed between the president of plaintiff and defendant J. R. Jordan, some of which are signed "J. R. Jordan," and others

"J. R. & W. M. Jordan Co., by J. R. Jordan." In these letters P. D. Camp, president, requests defendant J. R. Jordan to name a price for the timber. No price was named until July 21, 1922, when defendant wrote:

"We want $30,000.00 for what we have with (5) five years to cut same. Let us hear from you what you think of this."

On July 22d, Mr. Camp acknowledged receipt of this letter, writing:

"We thank you for the offer, but at the price you name, we don't see that there is any show for us to get together."

On the same sheet defendant Jordan answered:

"You make us an offer for our holdings and let's see if we can do business."

Several other letters passed between Mr. Camp, president, and J. R. Jordan, resulting in a visit of the latter to Franklin, Va., November 6, 1923.

Following some discussion between Mr. Camp and J. R. Jordan, in the office of the former, respecting the quantity and price of the timber, the following paper was written on the typewriter by Mr. Bonney, plaintiff's stenographer, by direction of defendant J. R. Jordan (Exhibit 1):

"Franklin, Va., Nov. 6, 1922.

"Camp Manufacturing Co., Franklin, Va.—Gentlemen: I will sell you the timber on the following tracts at the following prices: Bartonsville tract, $8.00 per thousand feet, Samuel Barnes tract, $7.00 per thousand feet, Gatling tract, $8.00 per thousand feet, Lowe tract, $6.00 per thousand feet and Jenkins tract $8.00 per thousand feet. Size of the timber to be cut ten inches in diameter and larger across the tree stump, twelve inches above the ground at the time of cutting. You are to select a man and I am to select a man to estimate this timber and if the two men thus selected can not agree, then we are to agree upon the third man. [The remainder of the paper refers to the terms of payment, cutting, etc., not material to the decision of the case.]

"—————————.

"By —————————."

This paper is not signed, but, in typewriting, on the lefthand corner are these words:

"This is the memorandum referred to in attached letter, signed by J. R. Jordan and W. M. Jordan, by J. R. Jordan, dated November 6, 1922. (Signed John R. Jordan, Camp Manufacturing Company, by P. D. Camp, President.)"

This writing is explained by reference to the following paper, typewritten, Exhibit 2:

"Franklin, Va., Nov. 6, 1922.

"Camp Manufacturing Co., Franklin, Va.—Gentlemen: Confirming conversation had with your Mr. P. D. Camp to-day in regard to five tracts of land that I want to sell, if Mr. W. N. Eley and myself can agree upon the number of feet per acre on what is known as the Bartonsville tract and the Barnes tract, then you can take them at the same price according to memorandum left with you to-day. You agreed to accept the estimate I furnish you on the Jenkins, Lowe and Gatling tracts. As to the other two tracts, after we get them estimated, then if you want them, you can take them at mine and Mr. Eley's estimate, that is, if Mr. Eley and myself can agree on the estimate;

it is optional with you whether you take them at the estimate or not according to the price named in the paper I left with you to-day.

"Yours very truly,        J. R. & W. M. Jordan Co.,

"By J. R. Jordan.

"The above is hereby accepted by us this the 6th day of November, 1922.

"[Signed] Camp Manufacturing Co.,

"By P. D. Camp, President."

Nothing further was done by the parties on November 6, 1922, in respect to the sale of the timber. Plaintiff alleges that Mr. Camp and J. R. Jordan came to an agreement as to the value of the timber standing on the Gatling tract at $3,000, on the Lowe tract $750, and on the Jenkins tract $960. Defendant alleges that the amount agreed upon for the timber on the Gatling tract was $3,600. The amount alleged as to the other two tracts is admitted.

The controversy is found in respect to the quantity of timber on the Bartonsville and Barnes tracts, which are owned by defendants Mrs. Sarah Ella Jordan, the mother of the other defendants. Neither Mrs. Jordan nor defendant W. M. Jordan were present at, nor is there any direct evidence tending to show that they had any knowledge or information regarding, the correspondence or conversation had between J. R. Jordan and Mr. Camp, or either of the witnesses examined, in regard to the purchase and sale of the timber.

It is necessary for a correct understanding of the controversy between defendant J. R. Jordan and P. D. Camp, president, to carefully examine their testimony and that of the other witnesses.

P. D. Camp says that—

Prior to November 6, 1922, he had caused estimates of the timber to be made. "Leading up to this transaction, trying to get together. Mr. Jordan came into the office, and we discussed this matter. I asked him to name a price on each tract of timber, and he named a price on each tract, and we had the estimate there in the office that day. I mean his estimate, he put down. After discussing this, and going over the different tracts, I had this identical timber estimated, and we agreed to take the three tracts according to the estimate, and Mr. Jordan agreed to the same. This led up to the signing of this paper. This was on November 6th. It was agreed on that day that defendant J. R. Jordan and W. M. Eley were to go on the other two, Bartonsville and Barnes, tracts, and estimate how much per acre—not on the number of feet—and make report. Jordan refused to sign the first paper." (Exhibit 1.)

W. M. Eley says that Jordan and himself were unable to agree upon the quantity of timber on the Bartonsville and Barnes tracts. He represented the plaintiff company and Jordan himself. They went over the two tracts. Jordan did not accept Eley's estimate per acre. Eley says that Jordan came to his stand at the fair and says:

"'We have to do some figuring on this now, so as to be able to report to Mr. Camp to-morrow.' He took his pencil and paper and started to figure. He wanted to figure how much the Bartonsville (tract) would have to cut per acre to bring it in the neighborhood of a certain lump sum of money. He figured it at eight (thousand), and I said, 'I cannot afford to put an estimate on the place at more than it will stand,' but for the sake of finding what it would bring I made the figures. I think I made at 7,500 feet per acre, and, based on the number of acres I thought was in the Bartonsville tract, I figured the whole price would be $24,000 or $25,000. For the sake of getting it straight that night, before we went to Franklin the next day, I wrote a

paper something like this: 'I hereby agree to sell the Camp Manufacturing Company the Bartonsville tract at 7,500 feet per acre, not to exceed 1,700,000 feet, and the Barnes tract at 5,000 feet per acre, not to exceed 450,000 or 500,000 feet'—I can't say which. On my way to Franklin in my car, Mr. Boone was with us, I said, 'You can sign it and I will hand it to Mr. Camp.' He said, 'No, we will wait and see what he has to say.' I told Mr. Camp we had not agreed and what it was. We did not agree right that minute. I went out and left him with Mr. Camp. In a few minutes Mr. Camp came out in the hall and said: 'Eley, you talk with Jordan and see if you can't come to some agreement.' I said, 'I don't see when we can come to an agreement. Jordan is figuring the Bartonsville tract at 7,500 feet and the Barnes tract at 5,000 feet.' He said: 'Close the matter up. I will allow him 7,500 feet for the Bartonsville and 5,000 for the Barnes tract.' And Jordan said, 'I believe I will take it.' I went with him to Mr. Ryland Camp's office and told him that Jordan said he would take his offer, repeating number of feet on each tract. While I was out of the office, at first, Jordan and P. D. Camp had agreed on the Barnes tract. Mr. Camp asked me whether I was willing to agree to 7,500 feet per acre. I said that I did not think that there was that much, but to get it settled I would agree to that quantity. I think I left the office at that time. Mr. Ryland Camp started figuring. Mr. Camp had had the Bartonsville tract surveyed and Mr. Jordan knew what his deed called for. I didn't know what occurred in there, but the next time I went in was when they did some figuring as to how much it would bring in money according to the acreage they had in mind, which I think was $22,900, and Mr. Camp was willing to close it right there at those figures, or else have it surveyed, and said, 'So far as the Howell land is concerned, I will let you go back to the old Howell line.' There was some contention about a line tree, and Mr. Camp said, 'A few acres will not make any difference,' and then I left the office again. The next time I saw them, we were starting home. Mr. Jordan said he hadn't made a deal and we went on home. That was about the day of it."

Witness, in answer to the question by plaintiff's counsel, says:

"You stated that you talked with Mr. Jordan at the vault and went back in and stated to Mr. Camp. What Mr. Camp was it that you made that statement to?" "Mr. P. D. Camp, who was in Mr. P. R. Camp's office."

"You stated to Mr. Camp that Mr. Jordan said he believed he would accept the 7,500 feet per acre?" "Mr. Jordan said, 'I can't sell it to him because he won't come to my figures.' Mr. Camp said, 'I will allow you 7,500 feet for the Bartonsville tract and 5,000 for the Barnes.' Then Mr. Jordan told Mr. Camp he would take it."

"What did Mr. Camp say to Mr. Jordan?" "Mr. Camp asked Mr. Jordan if it was all right, and Mr. Jordan went to the window and nodded his head and agreed on the 7,500 feet per acre, and I think Mr. P. D. Camp started in the conversation and figured how much it would bring in money, and I think they figured it at $22,900. Mr. Jordan and I figured it before."

Eley says, on cross-examination, that when Jordan and himself left Mr. Camp's office, he had not understood any trade had been made; that while they were going to Franklin on witness' car, Jordan said that he "would take $25,000 and not a cent less."

P. D. Camp, president of plaintiff company, testified to the transaction of November 6th, when the paper (Exhibit 1) and the memorandum on Exhibit 2 were signed. There is no material controversy in regard to that transaction. He says that—

When Eley and Jordan returned to Franklin on November 10th, "Jordan and I discussed this matter, and as to the Barnes tract Jordan said he was willing to take the estimate we had on it 450,000 feet and leave off the acreage. As I understood, we all agreed except as to the Bartonsville tract.

Jordan said there were 7,500 feet per acre on that tract. I asked Eley if he agreed to that. He said he would agree, although he did not think there was quite that much. I said, 'Then, if that is all, the only thing left to do is to survey the number of acres on the land, and then we can come at it, and we are ready and willing to settle and carry out the agreement'—told Jordan that. Eley, P. R. Camp, and Jones were present in my office. I told Jordan if he was not satisfied with the acreage, I would get a surveyor and he could get one; we will put two on if we cannot agree upon one, so there will be no mistakes or dispute as to the number of acres. There was no way to arrive at the number of acres except by survey."

On cross-examination, Mr. Camp said Jordan did not, on November 10th, say that he could not agree to Eley's estimate; he said that there were 7,500 per acre, but he figured the timber must bring him so much money. That he would take $26,000. I told him that we would not give that amount, but would stand on the contract we had made.

To the question, "There was not a definite understanding as to the Bartonsville tract of timber on November 10?" he answered:

"Except as to the number of feet per acre, which was to be surveyed and settled for at 7,500 feet per acre at $8.00."

The number of acres had not been agreed upon on November 10th, "because we had not put the surveyor on them. We put our surveyor there, but Mr. Jordan was not represented when we had a surveyor there. The lines have never been established or estimated."

To the question whether, at the time Jordan signed Exhibit 1 and memorandum on Exhibit 2, he did not say that he would do so with the understanding that his mother and brother would have to approve it, he replied: "There was not a word said about that; I am positive."

Defendant J. R. Jordan testified in regard to the transaction signing papers (Exhibits 1 and 2) November 6th. He does not disagree materially with Mr. Camp, except that he says:

"I told Mr. Camp when I was in there that my mother and brother were interested in this land, and any deal I made had to be with their consent. Mr. Eley said two farms belong to his mother, and Mr. Camp said that does not make any difference. Then Mr. Camp said, 'I will write another one.' Mr. Camp then wrote another paper, and I signed both. I had no authority to bind my mother—absolutely none—nor my brother. I told Mr. Camp so, and he said he knew it. My brother and I are in the mercantile business and farming together, but we do not own any land together, at all, as a partnership. My mother has not interest in the Jenkins, Lowe, and Gatling tracts."

"At the time I went to Mr. Camp's office, November 10th, I did not come to any agreement with Mr. Eley or with Mr. Camp, or any one representing plaintiff corporation."

Referring to the conversation with Eley in P. D. Camp's office, near the vault, on November 10th, to which Eley testified, Jordan says:

"When we went into Mr. Camp's office, Eley carried me into the vault and near about begged me to sign. I said: 'Well, I have nothing to give away, my folks aren't—the only thing in this world that will make me sign this is $26,000.' And that is the way I left and came out, and then Mr. P. D. Camp met us and carried us into Mr. Ryland Camp's office, and Mr. Camp said, 'If you won't agree, what will you take for the Bartonsville tract of timber?' I said, 'Mr. Camp, I want what it is worth.' He said, '$12,000?' I said, 'I was offered that five years ago—$12,500.' Then I said to him, 'Mr. Camp, it looks like I have been coming here ever since last June and have

been trying hard to sell it to you,' and then he asked me what I would take for it, and I said: 'I will make you one offer, and that is the last one to-day. That is to be confirmed over the phone with my mother and brother—that is, $26,000.' And Mr. Camp said: 'I cannot pay it. You will have to sell it to some one else.' Mr. Camp asked me to go to dinner with him. I went home and all three advertised the timber. Mr. Boone heard about it, and I went over there."

Jordan says, and this is admitted for the purpose of corroboration, as statements made by him, shortly after the transaction, that, on the next day following his return home from Franklin, he talked with the members of the finance committee of the Bank of Hertford—John F. Vann, W. P. Shaw, J. F. Mitchell, W. L. Daniel, and he thinks Mr. Boone. He owed the bank. Told them we had not sold the timber and could not do it. Also told my mother and brother.

T. P. Mitchell, J. E. Vann, W. P. Shaw, W. L. Daniel, and G. O. Hare were sworn and tendered by defendants for the purpose of showing statement testified by J. R. Jordan in regard to the alleged agreement in Franklin, November 10th. Objection by plaintiff. Objection sustained.

The foregoing constitutes substantially the oral testimony, including Exhibits 1 and 2.

On November 11, 1922, P. D. Camp, president of plaintiff, wrote defendants J. R. and W. M. Jordan:

"This is to notify you that we will take the Bartonsville tract and the Barnes tract, according to our agreement, entered into on November 6th and according to the statement rendered by your Mr. J. R. Jordan and W. M. Jordan, in regard to the number of feet per acre. The only thing that we see to be done is to survey and find out how many acres are in timber, or as far as the quantity of timber per acre and price is concerned, that has all been agreed to."

P. D. Camp says that his purpose in writing this letter was to get an admission in writing of the agreement. If this letter is relied upon as an acceptance of proposal made as alleged by J. R. Jordan on November 6th, there is an essential variation between the terms of the letter and the allegation in the bill in respect to the Barnes tract. The evidence on the part of the plaintiff is that the parties came to an agreement as to the quantity and amount to be paid for the Barnes tract and it is so alleged in the bill, at $3,150; whereas, the letter states that the quantity of the timber was to be ascertained by a survey of the land. This, however, is not very material. Defendant Jordan denies that an agreement was reached respecting the amount to be paid for the Barnes tract.

On December 4th, P. D. Camp wrote defendants J. R. and W. M. Jordan that he will, on December 13th, go to Bartonsville and "go over the tract of timber there," and will be glad to have them with him, but if they are not there he will go over it himself, as he "wants to try to close this matter up."

On December 7th he writes that he will go to the Bartonsville tract on December 15th. On December 14th he writes them that he went "down yesterday to look over the lines between you and ourselves and I feel sure that the western and northern lines are wrong." He writes

for a copy of the deed from Myrick for the land; thinks "we can straighten out the land all right, as soon as he can get a surveyor and try to have a meeting with them and see if they can close up the Bartonsville timber." Defendants did not answer the letter of November 11th and December 4th, but on December 15th J. R. Jordan wrote plaintiff:

"We received your letter last night. I would like to know what you meant when you said the line on the north and west of my land was not right. Are we on your land, or are we not far enough? Please let me know at once. We have been trying to sell you this timber since August and you have never made us an offer on it. I gave you my lowest price. If you want it for that you can (have) it. If not, it will be all right.

"Hoping to hear from you at an early date," etc.

On December 18th, P. D. Camp, president, wrote defendants J. R. and W. M. Jordan:

"We are in receipt of your letter of the 15th in answer to our letter. I was down there last week, and went around these lines; do not believe they run right and I have written to the clerk of the court to send me copies of some deeds, so we can have the lines properly run. Now, in regard to buying the timber, we want to get this matter closed up as our understanding is that you agreed to sell this timber at a certain price and on certain terms and it was to be left to Mr. Eley and Mr. J. R. Jordan to say how much it would run per acre and the only difference to be determined was how much it would run per acre. We agreed on all the tracts except the Bartonsville tract and you and Mr. Eley stated how much it was per acre and the only difference to be determined was how many acres are in timber. Therefore, we consider that this matter is closed except as to the number of acres in the Bartonsville tract, according to the papers, that Mr. J. R. Jordan signed here."

On December 23d Jordan wrote:

"Your letter of the 18th to hand. We were a little surprised at the attitude you are taking. Mr. Eley and the writer have never agreed to the number of feet per acre on either of the said tracts. I told you that day and I refused to sign the estimate that Mr. Eley turned in to you on the two tracts. [Signed] J. R. and W. M. Jordan, by J. R. Jordan."

On January 24, 1923, P. D. Camp, president, wrote defendants J. R. and W. M. Jordan:

"We have written you several times in regard to agreement with you for the purchase of the timber on five tracts of land in Hertford county, known as the Bartonsville, Barnes, Gatling, Lowe and Jenkins tracts. You have not done anything to indicate that you will abide by your agreement and we are hearing rumors that you are trying to sell it to other parties. We wish to notify you that we consider your agreement to sell to us the timber on these tracts and, unless you gentlemen will abide by the agreement, we expect to enforce it in whatever Court is necessary. Of course it is improper for you to attempt to sell the timber to any other parties and we shall do what we can to prevent your doing that. We ask that you arrange to make settlement in accordance with your agreement without further delay."

On January 29th, J. R. Jordan wrote acknowledging receipt of plaintiff's letter of the 24th, expressing surprise at the attitude taken by plaintiff, and advising that—

"I am going to sell this timber to the first party that offers me $27,500.00 for it between now and next Monday, which date will be the 5th day of February."

The bill herein was filed February 19, 1923.

Plaintiff alleges that—

On November 6, 1922, "the said Sarah Ella Jordan, John R. Jordan and William M. Jordan, partners trading as J. R. & W. M. Jordan Company, by John R. Jordan, their agent, and Sarah Ella Jordan, individually, by John R. Jordan, her agent, and William M. Jordan, by John R. Jordan, his agent, and John R. Jordan, individually and as agent for Sarah Ella Jordan, John R. Jordan and W. M. Jordan, partners trading as J. R. Jordan & W. M. Jordan Company and as agent for Sarah Ella Jordan individually, agreed to sell to your plaintiff, Camp Manufacturing Company, all of the timber on the said tracts above named, a written memorandum of which contract, signed by the said vendors, consisting of two sheets of paper, which is herewith filed, marked 'Exhibit A 1' and 'Exhibit A 2,' and asked to be read as a part of this bill.

"That, by the terms of said contract, the said vendors were required to sell to the said vendees all the timber on the said five tracts above named, * * * and the said vendee was required to pay for the timber on the Barnes tract, the sum of $3,150 and on the Gatling tract the sum of $3,000 and on the Lowe tract the sum of $750 and on the Jenkins tract the sum of $900, which sums are calculated on the basis of the price to be paid per thousand feet, as specified in the written memorandum of said contract, according to information furnished by the said John R. Jordan to the said vendee and accepted by the said vendee, and the said vendee was required to pay for the timber on the Bartonsville tract $8 per thousand feet, the number of thousand feet per acre on the Bartonsville tract to be agreed upon by the said John R. Jordan and a certain William M. Eley, * * * all of which will more fully appear by reference to the written memorandum."

That on November 10, 1922, the said John R. Jordan and the said W. M. Eley did agree upon the number of feet per acre on the Bartonsville tract, to wit, 7,500 feet per acre, and since the said agreement, the said vendee has offered to send surveyors upon the said Bartonsville tract to survey the same, and ascertain the number of acres in timber on the same, and has requested the said vendors to send a surveyor thereon, "who have refused to do so."

Plaintiff alleges a demand on defendants to perform the contract and their refusal so to do; that it is ready, willing, and able to perform the contract on its part, etc.

The prayer is for a decree for the specific performance of the contract in its entirety.

Defendants deny that J. R. Jordan was, or professed to be, the agent of defendant Sarah Ella Jordan in respect to the sale of the timber on the lands of said Sarah Ella Jordan, or that he had any authority to make such contract, as her agent, or otherwise.

That said J. R. Jordan had any authority to make any contract of the sale of the interest of W. M. Jordan in said timber.

That said J. R. Jordan, acting either for himself or as agent for either of the other defendants to sell the timber on the Bartonsville tract, made any contract to sell it on a basis of 7,500 feet per acre, or any other number of feet per acre, or otherwise.

That said J. R. Jordan, either for himself, or as agent for either of the other defendants, agreed to sell to plaintiff the timber on the Barnes tract for $3,150, or any other specific sum.

That defendant J. R. Jordan entered into an enforceable contract with plaintiff on November 6, 1922, for the sale of the timber on the Bartonsville or Barnes tracts.

By reason of the peculiar and unusual features of the dealings had between plaintiff and defendant J. R. Jordan and the specific denials of the material allegations in the bill and the conflict in the oral testimony heard by me and the exhibits, letters filed, etc., I have deemed it just to the parties and conducive to clarity in the discussion of the case to state the evidence in full.

[1, 2] Before proceeding to discuss the evidence and the principles of equity, upon the application of which the cause must be decided, it will be well to call attention to the fact that although the plaintiff alleges that, in the several transactions relied upon to establish a binding, enforceable contract upon the defendants Sarah Ella Jordan and W. M. Jordan, that they made the contract by J. R. Jordan, their agent, and "that said Jordan, acting as agent for said defendants, entered into the alleged contract," there is no suggestion or evidence, except from said Jordan, that the president of plaintiff company, or any officer of agent of said company, knew or referred to the fact that defendant Sarah Ella Jordan owned the two tracts in controversy, or that he represented himself as her agent, or professed to act as her agent. So far as appears from plaintiff's evidence, neither in the conversation nor the exhibits was any reference made to Mrs. Jordan's interest in the Bartonsville and Barnes tract. J. R. Jordan says that he notified Mr. Camp that what he proposed to do about the sale of these tracts was subject to the approval of his mother and brother. Mr. Camp not only denies this, but says that "positively nothing was said" by Jordan about the approval of his mother and brother. Eley also contradicts J. R. Jordan as to this alleged statement. So far as appears upon the two papers, Exhibits 1 and 2, and plaintiff's evidence in regard to the conversations, J. R. Jordan was contracting for the sale of the timber on the five tracts as his individual property, without any suggestion of any agency of, or agency in, the lands owned by his mother and brother. If, as a matter of fact, he was acting for an undisclosed principal, this fact may be shown by parol evidence, or if, acting without any authority, the owners of the land, with notice of his assumed agency, ratified his act, and it is otherwise of binding validity, the performance of the contract may be enforced against them. There is no suggestion, in the evidence, of any ratification. There is, however, a phase of the evidence upon which plaintiff relies to bind Mrs. Jordan for the act of J. R. Jordan, which will be disclosed later.

It will clarify the record to note that while J. R. and W. M. Jordan are engaged in the mercantile business and farming as partners, the uncontradicted evidence is that they owned the three tracts other than Bartonsville and Barnes tracts, in neither of which did they have any interest, as tenants in common and not as copartners. I find no evidence that either Sarah Ella Jordan, or W. M. Jordan, had knowledge, or information, that J. R. Jordan was negotiating with plaintiff for the sale of the timber. The business and other relations existing between J. R. and W. M. Jordan may originate an inference that he had such knowledge. No such inference should be indulged, as legal evidence, against Sarah Ella, that she had authorized J. R. Jordan to sell

her timber.  Whether, as contended by plaintiff, she is estopped to deny such agency by reason of other evidence, will be considered later.

[3] Passing to the merits of the controversy, certain elementary principles of equity jurisprudence applicable to the cause must be kept in view.  Plaintiffs ask for a decree against each of the defendants, compelling and by appropriate decrees enforcing specific performance of an alleged contract for the conveyance of standing timber trees, with the right, within a fixed period and upon fixed terms, to enter upon the land, cut and remove the trees.  This demand is resisted by each of the defendants for a number of reasons, assigned in their answer and urged by their counsel.  It is conceded that standing and growing timber trees savor of and constitute an essential element of real estate.  The right to enforce specific performance of executory contracts for their sale is based upon and, generally speaking, subject to, the same rules and limitations as contracts to convey the soil, upon which they stand.  This is elementary and does not call for the citation of authority—certainly other than standard Works on Equity Jurisprudence.

As elementary and basic, as is the doctrine itself, and always involved in its definition for reasons inhering in the nature of the remedial right is the limitation upon its administration that while equity will enforce specific performance, in all cases where the dispensation of exact justice would seem to require it, yet, on the other hand, it has been found necessary to circumscribe the exercise of this delicate and effective power by certain limitations.  "Specific performance is usually said to rest in the discretion of the chancellor.  This discretion, however, is a judicial discretion.  It is not a mere arbitrary will, but is subject to certain well-ascertained rules, within which its play is confined."  Bispham, Eq. (3d Ed.) § 371; Hennessy v. Woolworth, 128 U. S. 438, 9 Sup. Ct. 109, 32 L. Ed. 500; Leigh v. Crump, 36 N. C. 299; Rudisill v. Whitener, 146 N. C. 403, 59 S. E. 995, 15 L. R. A. (N. S.) 81.

[4, 5] Among the essential requirements prescribed by courts of equity to move them to grant this relief are that the contract must be based upon a valuable consideration.  It must be mutual, its terms must be certain, and its enforcement practicable.  Passing the contention of defendants, that the alleged contract relied upon by plaintiff is wanting in mutuality  for that plaintiff has not at any time assumed any legal, enforceable liability to purchase the timber, we pass to the second alleged vitiating element disclosed in the evidence—that, viewed from any aspect, its terms are not, nor have ever been, certain and defined.  While defendant J. R. Jordan did not sign the first paper writing relied upon (Exhibit 1), I am of the opinion that the two papers (Exhibits 1, 2) should be read together.  He signed Exhibit 2.  It constitutes an option given by himself to plaintiff, whereby it was entitled, when the quantity of timber on the several tracts was ascertained by the methods set forth, to call for the conveyance from J. R. Jordan of such interest as he had in the timber.  There is no denial that the quantity of timber on the Jenkins, Lowe, and Gatling tracts was agreed upon.  If plaintiff so desired, it could, by tendering the amount, so

ascertained to J. R. Jordan, have called for a deed for the timber, according to the terms of the contract. The effect of such deed upon the rights of W. M. Jordan and Sarah Ella Jordan would have been for the decision of the court.

We are thus brought to consider the real questions in controversy:

(1) Is plaintiff, upon the written and oral evidence, entitled to a decree as against defendant J. R. Jordan?

(2) Is it entitled to a decree as against W. M. Jordan?

(3) Is it entitled to a decree as against Sarah Ella Jordan?

It was one of the rules laid down by Lord Rosslyn, in Walpole v. Orford, 3 Ves. Jr. 420, that "all agreements, in order to be executed in this court, must be certain and defined," and the law as thus stated is well settled both in England and in this country, having been recognized in many cases in nearly all the states of the Union. This rule is, however, subject to two qualifications: First, that specific performance will not be refused if the uncertainty is owing to the fault of the defendant; and, second, that in obedience to the maxim, "Id certum est quod certum reddi potest," performance will be decreed if the means of ascertaining the contract are at hand.

In Carr v. Duval, 14 Pet. 77, 10 L. Ed. 361, it is said:

"If it be doubtful whether an agreement has been concluded, or is a mere negotiation, chancery will not decree a specific performance."

In Colson v. Thompson, 2 Wheat. 336, 4 L. Ed. 253, Judge Washington said:

"The contract which is sought to be specifically executed ought not only to be proved, but the terms of it should be so precise as that neither party could reasonably misunderstand them. If the contract be vague or uncertain, or the evidence to establish it be insufficient, a court of equity will not exercise its extraordinary jurisdiction to enforce it, but will leave the party to his legal remedy."

In Hennessy v. Woolworth, 128 U. S. 438, 9 Sup. Ct. 109, 32 L. Ed. 500, Harlan, Judge, said:

"It [specific performance] should never be granted unless the terms of the agreement sought to be enforced are clearly proved, or, when it is left in doubt whether the party against whom relief is asked in fact made such an agreement."

In that case, a decree was refused because, "to say the least," it was very doubtful, upon the conflicting evidence, "whether the defendant made the agreement relied upon."

In Dalzell v. Dueber Mfg. Co., 149 U. S. 315, 13 Sup. Ct. 886, 37 L. Ed. 749, Gray, Judge, affirming the decree of the Circuit Court, wherein the judge found that "the case is one in which different minds may well reach a contrary opinion of the merits," said:

"From the time of Lord Hardwicke, it has been the established rule that a court of chancery will not decree specific performance, unless the agreement is 'certain, fair and just in all its parts.' * * * And the rule has been repeatedly affirmed and acted on by this court."

In Pressed Steel Co. v. Hansen (3d Cir.) 137 Fed. 403, 71 C. C. A. 207, 2 L. R. A. (N. S.) 1172, Circuit Judge Gray said:

292 F.—13

"The bill being for the specific performance of a contract, such contract must be clearly and unequivocally proved, as stated. As proved, its terms as to subject-matter, consideration and all other essentials, must be explicit and unambiguous."

In Leigh v. Crump, 36 N. C. 299, Gaston, J., said:

"An agreement, to be carried into execution there, must be certain, fair and just in all its parts."

These, and many other authoritative decisions by chancellors, fix the standard which should guide the court in administering this ancient and most useful equitable means of redress.

[6, 7] The statute of frauds, 29 Car. II, in force in this state, requires that a memorandum of all contracts to convey any lands shall be in writing and signed by the party to be charged thereby, or by some other person by him thereto lawfully authorized. Consol. Stat. § 988. The memorandum must be sufficiently definite in its essential elements to comply with the requirements of the statute to enable the court to decree its specific performance. Latent ambiguities may be explained by parol evidence. It is manifest that the written memorandum signed by J. R. Jordan does not comply with the statute. The parol evidence introduced by plaintiff is essential to constitute an enforceable contract. The truth of plaintiff's allegation as to what was said by J. R. Jordan necessary to make a complete contract must be established by a preponderance of the evidence and must satisfy the court that the minds of the parties met and agreed upon the essential terms of the contract sufficiently certain and definite to enable the court to decree its performance. This wisdom of the rule as announced and enforced in the cases cited is illustrated in this case.

Conceding that the witnesses who testify as to the conversations between the president of plaintiff and defendant J. R. Jordan are equally truthful and honest, and that Mr. Camp understood that J. R. Jordan was willing to sell the timber on the Bartonsville tract on the basis of 7,500 feet per acre, there is equal basis for concluding that Jordan did not intend to do so. That notwithstanding the more or less disconnected conversation, in which Eley, desiring to bring the parties together, took part, in fact the minds of the two men never came together. That Camp was desirous of closing the deal on his terms, and that Jordan was equally desirious of securing $26,000 for the timber, as is abundantly proven, there is ample room for the view that, as Mr. Eley says that as they left Franklin, on November 10th, "Jordan felt he hadn't made a deal." Every declaration made by him upon reaching home is consistent with this view. His letters to Mr. Camp, subsequent to November 10th, corroborate this view.

Camp and Eley both testify that Jordan, on November 10th, while at Franklin, agreed to sell the timber on the Barnes tract for "a lump sum"—$3,150. This Jordan denies. On November 11th, when Mr. Camp writes Jordan for the purpose of getting him to admit the contract in writing and undertakes to set out its terms, he writes:

"This is to notify you that we will take the Bartonsville tract and the Barnes tract according to our agreement entered into November 6th and according to the statement rendered by your Mr. J. R. Jordan and Mr. W. M.

Eley in regard to the number of feet on each tract. The only thing that we see to be done in this is to survey and find out how many acres are in timber or so far as the quantity of timber per acre is concerned that has all been agreed to."

There is in this letter some confusion of thought or recollection by Mr. Camp when compared with his evidence. He writes in regard to a proposition made on November 6th, which he then accepts, and makes no distinction between the Bartonsville and Barnes tracts: whereas, he testifies that on November 10th the contract was closed as to both tracts, but on different terms. If, as he testifies, Jordan, on November 10th, agreed to sell the timber on the Barnes tract for a fixed sum, $3,150, was it necessary to survey that tract? Or, if the contract, as to both tracts, was, as alleged, completed on November 10th, was it necessary to "notify" the defendants that we will take Bartonsville tract and the Barnes tract?

[8] This may not be of much importance, but, when parties leave their agreements in parol, especially such as the statute requires to be in writing and signed, and they differ so sharply as here, the court is compelled to carefully consider every fact and circumstance prior to, at the time of, and subsequent to the alleged agreement for light to aid in the quest of truth, not to find that either of the parties has testified falsely, but to test their state of mind, their memory, and other means of reaching a correct conclusion.

If, after doing so, the mind of the court is left in doubt either as to what was said and done or as to what was intended, it must decline to render a decree for the plaintiff, leaving it to its remedy at law.

If the condition of the case is such that the court cannot, because of uncertainty find, whether any contract was made, and, if so, what were its terms, it cannot, with reason, be said that the failure to make it certain in both respects was by the fault of J. R. Jordan. The conversation in which it is claimed the contract in regard to the Bartonsville tract was made was had in the office of the president of plaintiff company, in which it appears from the contract of November 6th he had a stenographer and typewriter who could easily have made a memorandum of the terms of the agreement; he did so four days prior thereto, when Exhibits 1, 2 were written by him. The president had long and large experience in making contracts for the purchase of timber and evidently understood the necessity for having them written and signed. A suggestion to Jordan to make such memorandum and have him sign it would have directed his attention to the claim now made as to its terms.

When, on the next day, Mr. Camp wrote the letter referred to, he either did not understand, or did not recollect, the terms of the alleged agreement as now alleged. I am unable to fix upon Jordan the fault, in the failure to make a memorandum certain and definite in its language, of the result of the conversation.

[9] There is, however, another aspect of the case, which must be considered. Conceding, pro hac vice, that J. R. Jordan, on November 10th, agreed with plaintiff to sell the timber on the Bartonsville tract on a basis of 7,500 feet per acre, leaving the number of acres to be

ascertained by a survey of the land, each party selecting a surveyor and if they did not agree to select a third. There was a material element in regard to the value or price to be paid for the timber left open—uncertain.

Plaintiff's counsel frankly concede that, until this element of uncertainty is removed, and the number of acres ascertained, no decree can be made. They insist, however, that the method of ascertaining the number of acres was agreed upon and that plaintiff was, at all times, ready to have the survey made according to the agreement; that the case in this respect is within the second exception to the rule requiring certainty in terms of the contract.

In this I would concur if the only question to be settled by the survey was the number of acres within a definite, certain boundary. This would be easily ascertained, first, by measuring the lines, computing the acreage, and multiplying such number by the number of feet per acre.

It is manifest, however, from the letters written by Mr. Camp of December 14th and 18th, that there is uncertainty in regard to the boundary lines of the Bartonsville tract. He writes, December 14th, "I feel sure that the western and northern lines are wrong," and on December 18th, "From what I know of these lines, I do not believe that they are running right." This is the only evidence respecting the lines. How may the court, in this state of the case, decide where the correct boundary lines of the Bartonsville tract are and thereby fix the number of acres and the quantity of timber?

There is thus another element of uncertainty in the terms of the alleged agreement relied upon by plaintiff and which it seeks to have specifically enforced. While, for the reasons set forth, the plaintiff is not entitled to a decree, I think that I should not omit to dispose of the contention made by plaintiff that, conceding the absence of any evidence, as against defendant Sarah Ella Jordan, of authority in J. R. Jordan, to bind her by the contract, or that he was, or professed to be, her agent, she is estopped from denying such agency.

This contention is based upon the proposition that because of the evidence introduced regarding one other transaction, having no connection with that involved in this case, in which plaintiff and defendant Sarah Ella Jordan were concerned, wherein J. R. Jordan did certain acts, as her agent, that she thereby "held him out" to plaintiff as her agent, with authority to make and bind her by the contract to sell the timber in controversy. Considerable evidence, in respect to the first transaction, was introduced and is in the stenographic notes. The principal witness in regard to the transaction—Sarah Ella Jordan's relation to it and J. R. Jordan's conduct—is that of Mr. John E. Vann, who conducted the business. I do not deem it necessary to discuss it further than to say that I am unable to find in the evidence, from any viewpoint, any basis for holding that it is either evidence of, or constitutes an estoppel on, Sarah Ella Jordan to deny that J. R. Jordan was her agent, or had authority to make a binding, enforceable contract for the sale of the timber on the Bartonsville or Barnes tracts.

[10] I find no evidence upon which to base a decree against W. M. Jordan. The only evidence regarding the manner in which his brother J. R. Jordan and himself hold the title is that of J. R. Jordan, who says that it did not belong to them as partners. One tenant in common has no power to contract for the sale of his cotenants' interest in the land—there is no unity of title, only of possession.

Plaintiff, in its bill, does not ask for a decree against J. R. Jordan alone. It was the manifest intention of plaintiff and J. R. Jordan to deal with the proposition as an entirety. Upon a careful consideration of the pleadings and evidence, I am of the opinion that plaintiff is not entitled to a decree as prayed for. The bill will be dismissed, at the cost of plaintiff.